# 25-71

*To Be Argued By*:
TOMOKO ONOZAWA

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 25-71

❖◆❖

NATIONAL ORGANIZATION FOR WOMEN–NEW YORK CITY,

*Plaintiff-Appellant,*

—v.—

UNITED STATES DEPARTMENT OF DEFENSE,
UNITED STATES DEPARTMENT OF VETERANS AFFAIRS,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

JAY CLAYTON,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for Defendants-Appellees.*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2721

TOMOKO ONOZAWA,
BENJAMIN H. TORRANCE,
*Assistant United States Attorneys,*
*Of Counsel.*

**TABLE OF CONTENTS**

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . 1

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . . 3

Issues Presented for Review . . . . . . . . . . . . . . . . . . . 4

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.   Procedural History . . . . . . . . . . . . . . . . . . . . 4

    B.   Statutory and Regulatory Framework . . . . 5

        1.   DoD's IVF Benefits for Active-Duty
            Servicemembers . . . . . . . . . . . . . . . . . . 5

        2.   The VA's IVF Benefits for Veterans . . . 8

    C.   The District Court's Opinion . . . . . . . . . . . 11

Summary of the Argument . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . 16

POINT I—The District Court Lacked Jurisdiction
    over NOW's Claims Against the VA. . . . . . . . . 17

    A.   The VJRA Precludes NOW's Challenge to
        VA's Denial of Benefits. . . . . . . . . . . . . . . . 17

        1.   NOW's Challenge to the Denial of
            Benefits or Policies Underlying the
            Denial of Benefits Is Precluded. . . . . . 17

ii

PAGE

    2. The VJRA Bars Jurisdiction in
District Courts over Facial
Challenges to Statutes. . . . . . . . . . . . 22

  B. The District Court Lacked Jurisdiction
over NOW's Section 1557 Claims
Against the VA . . . . . . . . . . . . . . . . . . . . 25

POINT II—NOW Failed to State a Substantive Due
Process Claim Under the Fifth Amendment . . 30

POINT III—NOW Failed to State a Claim
Under the Affordable Care Act. . . . . . . . . . . . 41

POINT IV—DoD's Policy Is Not Arbitrary and
Capricious . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

iii

# TABLE OF AUTHORITIES

*Cases*:

*Akebia Therapeutics, Inc. v. Azar,*
    976 F.3d 86 (1st Cir. 2020) . . . . . . . . . . . . . . 52, 53

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) . . . . . . . . . . . . . . . . . . . . . . . 45

*Antonyuk v. James,*
    120 F.4th 941 (2d Cir. 2024) . . . . . . . . . . . . . . . 24

*Axon Enterprise, Inc. v. FTC,*
    598 U.S. 175 (2023) . . . . . . . . . . . . . . . . . . . . . . . 26

*Biediger v. Quinnipiac University,*
    691 F.3d 85 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 46

*Blue Water Navy Vietnam*
    *Veterans Ass'n, Inc. v. McDonald,*
    830 F.3d 570 (D.C. Cir. 2016) . . . . . . . .  19, 20, 22

*Bond v. United States,*
    564 U.S. 211 (2011) . . . . . . . . . . . . . . . . . . . . . . . 34

*Bowman Transportation, Inc. v. Arkansas-Best*
    *Freight System, Inc.,*
    419 U.S. 281 (1974) . . . . . . . . . . . . . . . . . . . . . . . 53

*Briscoe v. Health Care Serv. Corp.,*
    281 F. Supp. 3d 725 (N.D. Ill. 2017) . . . . . . . . . . 44

*Brooklyn Legal Services Corp. v. Legal Services Corp.,*
    462 F.3d 219 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 34

iv

PAGE

*Broudy v. Mather*,
　460 F.3d 106 (D.C. Cir. 2006) . . . . . . . . . . . . . . . 20

*California v. EPA*,
　72 F.4th 308 (D.C. Cir. 2023) . . . . . . . . . . . . 54, 57

*Camacho v. Nicholson*,
　21 Vet. App. 360 (2007) . . . . . . . . . . . . . . . . . . . 28

*Chance v. Rice University*,
　984 F.2d 151 (5th Cir. 1993) . . . . . . . . . . . . . . . 46

*Cleveland Board of Education v. LaFleur*,
　414 U.S. 632 (1974) . . . . . . . . . . . . . . . . . . . . . . . 35

*Community Health Choice, Inc. v. United States*,
　970 F.3d 1364 (Fed. Cir. 2020) . . . . . . . . . . . . . . 29

*County of Westchester v. HUD*,
　802 F.3d 413 (2d Cir. 2015) . . . . . . . . . . . . . . . . 50

*Disabled American Veterans v. VA*,
　962 F.2d 136 (2d Cir. 1992) . . . . . . . . . . . . . 22, 24

*Doe v. BlueCross BlueShield of Tennessee, Inc.*,
　926 F.3d 235 (6th Cir. 2019) . . . . . . . . .   42, 43, 45

*Doe v. CVS Pharmacy, Inc.*,
　982 F.3d 1204 (9th Cir. 2020) . . . . . . . . . . . . . . 43

*Eisenstadt v. Baird*,
　405 U.S. 438 (1972) . . . . . . . . . . . . . . . . . . . . . . . 35

*Elgin v. Department of Treasury*,
　567 U.S. 1 (2012) . . . . . . . . . . . . . . . . . . . . . . . *passim*

*FCC v. Beach Communications, Inc.*,
　508 U.S. 307 (1993) . . . . . . . . . . . . . . . . .   35, 36, 40

v

PAGE

*FCC v. Prometheus Radio Project,*
 592 U.S. 414 (2021). . . . . . . . . . . . . . . . . . . . . . 51, 53

*Free Enterprise Fund v. Public Company*
 *Accounting Oversight Board,*
 561 U.S. 477 (2010). . . . . . . . . . . . . . . . . . . . . . . . 27

*Gonzales v. Raich,*
 545 U.S. 1 (2005). . . . . . . . . . . . . . . . . . . . . . . . . 25

*Hanlin v. United States,*
 214 F.3d 1319 (Fed. Cir. 2000). . . . . . . . . . . . . . . 20

*Harris v. McRae,*
 448 U.S. 297 (1980). . . . . . . . . . . . . . . . . 31, 32, 33

*Heckler v. Ringer,*
 466 U.S. 602 (1984). . . . . . . . . . . . . . . . . . . . . . . 29

*Heller v. Doe,*
 509 U.S. 312 (1993). . . . . . . . . . . . . . . . . . . . . . . 38

*Jackson v. Birmingham Board of Education,*
 544 U.S. 167 (2005). . . . . . . . . . . . . . . . . . . . . . . 46

*Johnson v. Robison,*
 415 U.S. 361 (1974). . . . . . . . . . . . . . . . . . . . . . . 22

*Jones v. Derwinski,*
 968 F.2d 1497 (2d Cir. 1992) . . . . . . . . . 17, 18, 19

*JP Morgan Chase Bank v. Altos Hornos de Mexico,*
 412 F.3d 418 (2d Cir. 2005) . . . . . . . . . . . . . . . . 41

*Lorillard v. Pons,*
 434 U.S. 575 (1978). . . . . . . . . . . . . . . . . . . . . . . 52

vi

PAGE

*Lucas v. VHC Health*,
128 F.4th 213 (4th Cir. 2025) . . . . . . . . . . . . . . . 42

*Mabry v. State Board of Community Colleges*,
813 F.2d 311 (10th Cir. 1987) . . . . . . . . . . . . . . 45

*Maher v. Roe*,
432 U.S. 464 (1977) . . . . . . . . . . . . . . . . . . . . . . 34, 35

*Mayo Foundation v. United States*,
562 U.S. 44 (2011) . . . . . . . . . . . . . . . . . . . . . . 55, 57

*McKelvey v. Turnage*,
792 F.2d 194 (D.C. Cir. 1986) . . . . . . . . . . . . . . . 20

*MediNatura, Inc. v. FDA*,
998 F.3d 931 (D.C. Cir. 2021) . . . . . . . . . . . . . 54, 56

*Minnesota v. Clover Leaf Creamery Co.*,
449 U.S. 456 (1981) . . . . . . . . . . . . . . . . . . . . . . 38

*Motor Vehicle Manufacturers Ass'n v.
State Farm Mutual Auto. Ins. Co.*,
463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . 51, 54, 55

*Names Redacted by Agency*,
Docket No. 16-35 496A, 2019 BVA LEXIS 6443
(B.V.A. Jan. 4, 2019) . . . . . . . . . . . . . . . . . . . . . . 30

*National Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) . . . . . . . . . . . . . . . . . . . . . . 34

*Niagara Mohawk Power Corp. v.
Hudson River-Black River Regulating Dist.*,
673 F.3d 84 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 31

vii

PAGE

*Nordlinger v. Hahn*,
  505 U.S. 1 (1992) . . . . . . . . . . . . . . . . . . . 35, 44, 50

*Nungesser v. Columbia University*,
  169 F. Supp. 3d 353 (S.D.N.Y. 2016) . . . . . . . . . 46

*Obergefell v. Hodges*,
  576 U.S. 644 (2015) . . . . . . . . . . . . . . . . . . . . . . . 35

*Pavan v. Smith*,
  582 U.S. 563 (2017) . . . . . . . . . . . . . . . . . . . . . . . 35

*Petite v. McDonough*,
  35 Vet. App. 64 (2021) . . . . . . . . . . . . . . . . . . . . 30

*Poloceno v. Dallas Independent School District*,
  826 F. App'x 359 (5th Cir. 2020) . . . . . . . . . . . . 46

*Powers v. McDonough*,
  713 F. Supp. 3d 695 (C.D. Cal. 2023) . . . . . . . . 28

*Recinto v. VA*,
  706 F.3d 1171 (9th Cir. 2013) . . . . . . . . . . . . . . 24

*Regan v. Taxation With Representation*,
  461 U.S. 540 (1983) . . . . . . . . . . . . . . . . . . . . . . . 34

*Regents of the University of California*,
  591 U.S. 1 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Religious Sisters of Mercy v. Becerra*,
  55 F.4th 583 (8th Cir. 2022) . . . . . . . . . . . . . . . . 42

*Rumble v. Fairview Health Services*,
  No. 14-CV-2037, 2015 WL 1197415
  (D. Minn. Mar. 16, 2015) . . . . . . . . . . . . . . . . . . 43

viii

PAGE

*Rust v. Sullivan*,
    500 U.S. 173 (1991) . . . . . . . . . . . . . . . . . . . . 32, 33

*Safari Club Int'l v. Salazar*,
    709 F.3d 1 (D.C. Cir. 2013) . . . . . . . . . . . . . . . . 51

*Saint-Jean v. Emigrant Mortgage Co.*,
    129 F.4th 124 (2d Cir. 2025) . . . . . . . . . . . . . . . 48

*Schmitt v. Kaiser Foundation Health Plan*,
    965 F.3d 945 (9th Cir. 2020) . . . . . . . . . . . . 45, 46

*Schweiker v. Wilson*,
    450 U.S. 221 (1981) . . . . . . . . . . . . . . . . . 36, 37, 40

*Southeastern Pennsylvania Transportation
    Authority v. Gilead Sciences, Inc.*,
    102 F. Supp. 3d 688 (E.D. Pa. 2015) . . . . . . . . . 44

*Tannerite Sports, LLC v. NBCUniversal News Group*,
    864 F.3d 236 (2d Cir. 2017) . . . . . . . . . . . . . . . . 26

*Texas Department of Housing & Community Affairs
    v. Inclusive Communities Project, Inc.*,
    576 U.S. 519 (2015) . . . . . . . . . . . . . . . . . . . . 48, 50

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) . . . . . . . . . . . . . . . . . . . . 26, 27

*Tilton v. SEC*,
    824 F.3d 276 (2d Cir. 2016) . . . . . . . . . . 26, 27, 28

*Tsirelman v. Daines*,
    794 F.3d 310 (2d Cir. 2015) . . . . . . . . . . . . . . . . 16

*U.S. Railroad Retirement Board v. Fritz*,
    449 U.S. 166 (1980) . . . . . . . . . . . . . . . . . . . . . . 37

ix

PAGE

*United States v. Skrmetti*,
    145 S. Ct. 1816 (2025). . . . . . . . . . . . . . . . . . . 31, 34

*Van Hollen v. FEC*,
    811 F.3d 486 (D.C. Cir. 2016). . . . . . . . . . . . . . . 53

*Vance v. Bradley*,
    440 U.S. 93 (1979). . . . . . . . . . . . . . . . . . . . . . . . 38

*Vermont Yankee Nuclear Power Corp. v. NRDC*,
    435 U.S. 519 (1978). . . . . . . . . . . . . . . . . . . . . . . 54

*Veterans for Common Sense v. Shinseki*,
    678 F.3d 1013 (9th Cir. 2012) . . . . . . . . . . . . 21, 22

*In re Vivendi, S.A. Securities Litigation*,
    838 F.3d 223 (2d Cir. 2016) . . . . . . . . . . . . . . . . 23

*Watson v. Fort Worth Bank & Trust*,
    487 U.S. 977 (1988). . . . . . . . . . . . . . . . . . . . . . . 50

*Webster v. Reproductive Health Services*,
    492 U.S. 490 (1989). . . . . . . . . . . . . . . . . . . . 32, 33

*Weinreb v. Xerox Business Services, LLC*
    *Health & Welfare Plan*,
    323 F. Supp. 3d 501 (S.D.N.Y. 2018) . . . . . . . . . 47

*Weinreb v. Xerox Business Services*,
    No. 16 Civ. 6823, 2020 WL 4288376
    (S.D.N.Y. July 27, 2020) . . . . . . . . . . . . . . . . . . . 43

*Williamson v. Lee Optical of Oklahoma Inc.*,
    348 U.S. 483 (1955). . . . . . . . . . . . . . . . . . . . . . . 38

*Wolfe v. McDonough*,
    28 F.4th 1348 (Fed. Cir. 2022) . . . . . . . . . . . . . . 29

x

PAGE

*York v. Wellmark, Inc.*,
No. 16-cv-627, 2017 WL 11261026
(S.D. Iowa Sept. 6, 2017) . . . . . . . . . . . . . . . . . . . . 44

*Yu v. Vassar College*,
97 F. Supp. 3d 448 (S.D.N.Y. 2015) . . . . . . . . . . 46

*Statutes*:

10 U.S.C. § 1072 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

10 U.S.C. § 1073d . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

10 U.S.C. § 1074 . . . . . . . . . . . . . . . . . . . . . . . . *passim*

10 U.S.C. § 1074d . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

10 U.S.C. § 1075a . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

10 U.S.C. § 1079 . . . . . . . . . . . . . . . . . . . . . . . . . 7, 51

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

29 U.S.C. § 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

38 U.S.C. § 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

38 U.S.C. § 511 . . . . . . . . . . . . . . . . . . 17, 18, 24, 27

38 U.S.C. § 1705 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

38 U.S.C. § 1710 . . . . . . . . . . . . . . . . . . . . . . . . . 5, 40

38 U.S.C. § 1712 . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

38 U.S.C. § 1728 . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

xi

PAGE

38 U.S.C. § 5107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

38 U.S.C. § 7104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

38 U.S.C. § 7105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

38 U.S.C. § 7252 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

38 U.S.C. § 7292 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

38 U.S.C. § 7301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. § 12101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

42 U.S.C. § 18116 . . . . . . . . . . . . . . . . . . . . 26, 42, 47

National Defense Authorization Act for Fiscal Year
    2008, Pub. L. No. 110-181, § 1633, 122 Stat. 3
    (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Consolidated Appropriations Act, 2023, Pub. L. No.
    117-328, Div. J, Title II, § 234, 136 Stat. 4459
    (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Consolidated Appropriations Act, 2024, Pub. L. No.
    118-42, Div. A, Title II, § 234, 138 Stat. 25 (2024)
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Continuing Appropriations and Military
    Construction, Veterans Affairs, and Related
    Agencies Appropriations Act, Pub. L. No. 114-223,
    § 260, 130 Stat. 857, 897 (2016) . . . . . . . . . . . . . . . 9

*Regulations*:

5 C.F.R. § 890.203 . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

5 C.F.R. § 890.502 . . . . . . . . . . . . . . . . . . . . . . . . . . 40

xii

PAGE

32 C.F.R. § 199.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

32 C.F.R. § 199.4 . . . . . . . . . . . . . . . . . . . . . 7, 38, 56

32 C.F.R. § 199.17 . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

38 C.F.R. § 3.102 . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

38 C.F.R. § 17.36 . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

38 C.F.R. § 17.38 . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

38 C.F.R. § 17.380 . . . . . . . . . . . . . . . . . . . . . . . 10, 11

Fertility Counseling and Treatment for Certain
    Veterans and Spouses, 82 Fed. Reg. 6273 (Jan. 19,
    2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Fertility Counseling and Treatment for Certain
    Veterans and Spouses, 84 Fed. Reg. 8254 (Mar. 7,
    2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Instructions for Determining Eligibility for In Vitro
    Fertilization (IVF) Benefit, 89 Fed. Reg. 23,518
    (2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Nondiscrimination in Health Programs and
    Activities, 81 Fed. Reg. 31,375 (2016) . . . . . . . . 44

Nondiscrimination in Health Programs and
    Activities, 85 Fed. Reg. 37,160 (2020) . . . . . . . . 44

Nondiscrimination in Health Programs and
    Activities, 89 Fed. Reg. 37,522 (2024) . . . . . . . . 45

*Other Authorities:*

159 Cong. Rec. S3611-03 (May 20, 2013) . . . . . . . . . 36

xiii

PAGE

Executive Order No. 14,216, 90 Fed. Reg. 10,451
(Feb. 18, 2025). . . . . . . . . . . . . . . . . . . . . . . . . . . 56

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 25-71

———————

NATIONAL ORGANIZATION FOR WOMEN–
NEW YORK CITY,

*Plaintiff-Appellant,*

—v.—

UNITED STATES DEPARTMENT OF DEFENSE,
UNITED STATES DEPARTMENT OF VETERANS AFFAIRS,

*Defendants-Appellees.*

———————

## BRIEF FOR DEFENDANTS-APPELLEES

———————

### Preliminary Statement

Since 2012, the Department of Defense ("DoD") has offered benefits for assisted reproductive technology services, including in vitro fertilization ("IVF") services, to both male and female members of the armed services who, while on active duty, incurred a serious illness or injury that led to the loss of their natural procreative ability. And since 2016, Congress has authorized the Department of Veterans Affairs ("VA") to provide those services to veterans of the armed forces who have a service-connected disability—that is, one

2

incurred in the line of duty—that resulted in the inability to procreate without fertility treatment. Plaintiff-appellant National Organization for Women–New York City ("NOW") challenges those policies, contending that having provided and subsidized those services, DoD and the VA must do so even more widely, despite the statutory limits on the VA's and DoD's authority.

The district court correctly rejected those claims. To begin with, that court lacked jurisdiction over challenges to the VA's policy. Congress has created a detailed and comprehensive system for review of decisions related to VA benefits, culminating in Article III review by a federal court of appeals. That review scheme expressly prohibits review by any other court, even over constitutional challenges. And while this Court previously held that certain facial challenges to statutes affecting VA benefits may be pursued in district court, intervening case law from the Supreme Court has made clear that exception cannot stand. In any event, NOW's purported facial challenge is, as the district court concluded, effectively a dispute over the denial of benefits and therefore falls within the exclusive administrative review system.

NOW's claims also fail on the merits. While it asserts that DoD's and the VA's eligibility requirements for IVF coverage infringe upon a constitutional right to procreate, the Supreme Court has clearly and repeatedly held that a government decision not to subsidize the exercise of a right—or to subsidize it for some people but not everyone—is not a violation of that right. NOW also alleges that the eligibility

3

requirements violate a nondiscrimination provision of the Affordable Care Act because they disparately impact men and women. But that statute does not allow disparate-impact claims for sex discrimination; and even if it did, NOW has not plausibly pleaded any such discrimination.

Nor is DoD's eligibility requirement arbitrary and capricious. Congress has authorized extended health benefits for servicemembers who incur serious illness or injury while on active duty, and DoD relied on that statutory authority to provide IVF benefits. The statute itself thus requires DoD's eligibility limitation. While NOW maintains that DoD could have invoked other statutory authorities, those alternatives would require greater limitations on IVF services, and no law mandates that DoD consider those other statutes or explain why it did not utilize them.

For all those reasons, the district court's judgment should be affirmed.

### Jurisdictional Statement

As explained below, the district court lacked jurisdiction over NOW's claims against the VA because the Veterans Judicial Review Act ("VJRA") precludes judicial review of those claims. *See infra* Argument, Point I. The district court had jurisdiction over NOW's remaining claims pursuant to 28 U.S.C. § 1331. On October 31, 2024, the district court entered an order dismissing all of NOW's claims against the VA and certain of its claims against DoD. On December 5, 2024, the district court dismissed the remainder of NOW's claims without prejudice. (Joint Appendix ("JA") 255-

4

57). NOW timely filed a notice of appeal on January 6, 2025. (JA 258). Accordingly, this Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## Issues Presented for Review

1. Whether the district court lacked subject matter jurisdiction over NOW's claims challenging VA's IVF benefits policy where the VJRA establishes a separate review scheme for claims relating to the agency's provision of benefits.

2. Whether NOW failed to state a claim for relief under the Fifth Amendment's Due Process Clause.

3. Whether NOW failed to state a claim for relief under section 1557 of the Affordable Care Act ("ACA").

4. Whether NOW failed to state a claim for relief under the Administrative Procedure Act ("APA").

## Statement of the Case

### A.  Procedural History

NOW commenced this lawsuit on August 2, 2023 (JA 3) and filed an amended complaint on February 9, 2024 (JA 13-44). On March 15, 2024, the government moved to dismiss the amended complaint under Rules 12(b)(1) and 12(b)(6). On October 31, 2024, the district court granted the government's motion as to certain claims (JA 233-54), and NOW then voluntarily dismissed the remainder of its claims without prejudice (JA 255-57). This appeal followed. (JA 258).

5

## B. Statutory and Regulatory Framework

Active-duty servicemembers are ordinarily eligible for health care benefits through the TRICARE program, administered by DoD. 10 U.S.C. § 1072(7). Qualified veterans are generally eligible for health care benefits through the Veterans Health Administration ("VHA"), administered by the VA. 38 U.S.C. §§ 1705, 1710, 7301.

### 1. DoD's IVF Benefits for Active-Duty Servicemembers

An active-duty servicemember is "entitled to medical and dental care in any facility of any uniformed service." 10 U.S.C. § 1074(a)(1). In addition, subject to certain limits, DoD may "provide medical and dental care" to servicemembers "in private facilities." *Id.* § 1074(c)(1). In 2008, Congress amended the statutory provision permitting care in private facilities to also provide for "extended benefits" for servicemembers "who incur a serious injury or illness on active duty." *Id.* § 1074(c)(4)(A) (allowing for "coverage comparable to that provided" to dependents of servicemembers under § 1079(d) and (e)). This extended-benefits program "may include the provision of comprehensive health care services . . . to assist in the reduction of the disabling effects of . . . a serious physical disability[ ] or . . . an extraordinary physical or psychological condition." *Id.* § 1079(d).

Congress directed DoD to issue regulations setting forth a definition of "serious injury or illness." *Id.* § 1074(c)(4)(B)(ii). DoD accordingly issued a directive defining the phrase to include Category II and

6

Category III conditions. DoD Directive 1300.24 at 14 (Encl. 4) (2009), https://perma.cc/49AG-2N76. Category II is "a serious injury or illness" where the servicemember is "unlikely to return to duty within a time specified by his or her Military Department" and "[m]ay be medically separated from the military." *Id.* Category III is "a severe or catastrophic injury or illness" where the servicemember is "highly unlikely to return to duty" and "[w]ill most likely be medically separated from the military." *Id.*

Relying on DoD's extended-benefits authority, the Secretary of Defense directed the provision of IVF benefits in an April 27, 2010, "Policy for Provision of In Vitro Fertilization Services for the Benefit of Seriously Injured Service Members." (Dist. Ct. ECF No. 52-1) ("2010 DoD Memo"). That memorandum recognized that the two extended-benefits statutory provisions—§ 1074(c)(4) and its incorporation by reference of § 1079(d), (e)—provided new authority to offer IVF benefits, which did not previously exist under the TRICARE program.[1]

_____

[1]    TRICARE covers medically necessary infertility testing and treatment, including correction of the physical causes of infertility (*e.g.*, through surgical procedures and fertility medications), which would then allow for natural conception. While assisted reproductive technology services may be necessary to circumvent fertility issues and achieve pregnancy, these services do not treat an illness, injury, or bodily malfunction (including infertility) and are thus excluded from coverage under the TRICARE Basic (*i.e.*,

7

DoD then implemented its IVF policy in an April 3, 2012, "Implementing Guidance Memorandum" titled "Policy for Assisted Reproductive Services for the Benefit of Seriously or Severely Ill/Injured (Category II or III) Active Duty Service Members." (JA 46-49 ("2012 DoD Memo")). Under the 2012 DoD Memo, IVF benefits were available "to service members, regardless of gender, who have sustained serious or severe illness/ injury while on active duty that led to the loss of their natural procreative ability." (JA 46). The 2012 DoD Memo further provided that the "[b]enefit would apply equally to male and female seriously or severely injured service members (Category II or III)." (JA 47). The IVF "benefit [was] designed to allow the member and spouse to become biological parents through reproductive technologies where the Active Duty injury or illness ha[d] made it impossible to conceive naturally." (JA 47). For that reason, the benefits provided were "limited to permitting a qualified member to procreate with his or her lawful spouse," and "[t]hird party donations and surrogacy [were] not covered benefits." (JA 47).

Following a review of its IVF policy, in March 2024, DoD amended the 2012 DoD Memo to remove the categorical eligibility bar on those who are unmarried or require donor gametes (*i.e.*, from a non-spouse). (JA 99-105 ("2024 DoD Memo")). The amended policy "applies to all qualifying Service members, regardless of gender or marital status" (JA 100) and permits

———————

medical) benefit program. 10 U.S.C. § 1079(a)(12); 32 C.F.R. §§ 199.4(e)(3)(i)(B)(3) and (g)(34).

8

"[u]se of donated third-party gametes or embryos . . . when provided at the qualifying Service member's expense" (JA 101). The amended policy also covers certain IVF services that are "rendered to a qualifying Service member's lawful spouse, unmarried partner, or a third-party gestational carrier" where such person is enrolled in a TRICARE health plan option. (JA 101).

In short, as long as the Category II or III illness or injury occurred while the servicemember was on active duty and caused the servicemember's inability to procreate without the use of assisted reproductive technology, the servicemember is eligible for these extended benefits. (JA 99-100, 103-04 (setting forth requirements for referral to assisted reproductive services program)).[2] DoD does not require servicemembers who meet the above requirements to further demonstrate that their serious or severe illness or injury is service-connected.

## 2. The VA's IVF Benefits for Veterans

In 2016, the Continuing Appropriations and Military Construction, Veterans Affairs, and Related

---

[2] *See* TRICARE Operations Manual 6010.62-M, https://manuals.health.mil/pages/DisplayManualHtml-File/2025-01-17/AsOf/TOT5/C17S3.html (April 2021), ¶¶ 2.7.2.11.6.1.3 *et seq.* (setting out requirements for referral to ART services, including confirmation of Category II or III status, qualifying diagnosis, and summary of relevant medical information, but not requiring information about service-connection or line of duty).

9

Agencies Appropriations Act authorized the VA to use appropriated medical services funds to provide, for the first time, IVF services to certain veterans. Pub. L. No. 114-223, § 260, 130 Stat. 857, 897 (2016). That authorization has been regularly renewed by Congress, including in the Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, Div. J, Title II, § 234, 136 Stat. 4459 (2023), and again in the Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, Div. A, Title II, § 234, 138 Stat. 25 (2024) ("VA Appropriations Act" or "section 234").

The VA Appropriations Act, as in earlier years, provides that funds appropriated to the VA "may be used to provide . . . fertility counseling and treatment using assisted reproductive technology to a covered veteran or the spouse of a covered veteran." 138 Stat. 54, § 234(a). The statute defines a "covered veteran" to mean "a veteran . . . who has a service-connected disability that results in the inability of the veteran to procreate without the use of fertility treatment." *Id.* § 234(b)(2). "Assisted reproductive technology" is defined in the Act as "benefits relating to reproductive assistance provided to a member of the Armed Forces who incurs a serious injury or illness on active duty pursuant to [10 U.S.C. § 1074(c)(4)(A)], as described in" the 2012 DoD Memo and related guidance. *Id.* § 234(b)(3). A "service-connected" disability means one "incurred or aggravated . . . in line of duty in the active military, naval, air, or space service." 38 U.S.C. § 101(16).

After Congress authorized the VA to cover certain IVF services, the VA promulgated an Interim Final

10

Rule, 82 Fed. Reg. 6273 (Jan. 19, 2017), which was finalized on March 7, 2019, 84 Fed. Reg. 8254; 38 C.F.R. § 17.380. Under the VA regulation, IVF benefits may be provided when clinically appropriate to a "veteran who has a service-connected disability that results in the inability of the veteran to procreate without the use of fertility treatment," and to their spouse. 38 C.F.R. § 17.380(a)(1)(i)-(ii). "[S]ervice-connected disability" is defined to mean "for a male veteran, a service-connected injury or illness that prevents the successful delivery of sperm to an egg; and, for a female veteran with ovarian function and a patent uterine cavity, a service-connected injury or illness that prevents the egg from being successfully fertilized by sperm." *Id.* § 17.380(a)(2). The VA regulation states that IVF treatment will be provided when clinically appropriate to the same extent such treatment is provided to a servicemember under 10 U.S.C. § 1074(c)(4)(A), as described in the 2012 DoD Memo and implementing guidance. *Id.* § 17.380(a)(3).

VHA Directive 1334, "In Vitro Fertilization Counseling and Services Available to Certain Eligible Veterans and Their Spouses," dated March 12, 2021, memorializes the VA's policy for the provision of IVF services to eligible veterans and their spouses. (JA 51). It recognizes that "section 234(b)(3) defines 'assisted reproductive technology' as: assistance provided to a member of the Armed Forces who incurs a serious injury or illness . . . , as described in the [2012 DoD Memo]." (JA 53). Because "the benefit is designed to allow the member and spouse to become biological parents through reproductive technologies where the Active Duty injury or illness has made it impossible to

11

conceive naturally," VA Directive 1334 barred "the use of donated sperm, oocytes, or embryos, or gestational surrogacy." (JA 55 (citing 2012 DoD Memo)).

On April 4, 2024, the VA amended its IVF benefits policy to conform to the 2024 DoD Memo ("2024 VA Policy"). 89 Fed. Reg. 23,518 (Apr. 4, 2024) (codified at 38 C.F.R. Part 17) (JA 107-20). Under the 2024 VA Policy, IVF benefits no longer require covered veterans to be married, to be in an opposite-sex relationship, or to be able to produce their own gametes. (JA 109, 114). However, the VA's amended policy retained the requirement that a veteran have a "service-connected disability that results in the inability of the veteran to procreate without the use of fertility treatment." (JA 109); 38 C.F.R. § 17.380(a)(1)(i), (a)(2).

The "service-connected" limitation appears in section 234, regarding benefits provided by the VA. However, as described above, no such limitation is present for DoD extended benefits, governed by 10 U.S.C. § 1074(c)(4), which are provided to any servicemember who incurs a serious illness or injury while on active duty—regardless of whether it was incurred in the line of duty—if that illness or injury causes the inability to procreate without assisted reproductive technology. (*Contra* Brief for Plaintiff-Appellant ("Br.") 2 (describing service-connection requirement as applicable to both veterans and servicemembers)).

## C.   The District Court's Opinion

NOW filed this action on its own behalf and on behalf of its members, challenging the DoD and VA IVF policies under the Fifth Amendment of the Constitu-

12

tion, section 1557 of the Affordable Care Act, and the APA. (JA 13-44). NOW challenged the agencies' IVF policies as they existed at the time, but two of those challenges became moot when the agencies changed policy in accordance with the 2024 DoD Memo, and were later voluntarily dismissed. On October 31, 2024, the district court granted the government's motion to dismiss NOW's claims regarding the remaining conditions. (JA 233-54).

The district court held that the VJRA deprived it of subject matter jurisdiction over NOW's claims against the VA. (JA 241-44). The district court noted that the plain language of the VJRA states that the VA "'shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits to veterans,'" and that such decisions are "'final and conclusive and may not be reviewed by any other official or by any court'" except as otherwise provided. (JA 242 (quoting 38 U.S.C. § 511(a); alteration omitted)). Because NOW "is essentially challenging the denial of benefits on behalf of its members," the district court concluded the VJRA applies, and "[t]he fact that [NOW] alleges constitutional violations stemming from the denial of benefits does not change the analysis." (JA 243-44).

The district court next dismissed NOW's claims for failure to state a claim. First, it rejected NOW's claim that the eligibility limitations were subject to strict scrutiny because they violated the "fundamental right to procreate." (JA 247-49). While recognizing that "the liberty protected by the Due Process Clause affords protection against unwarranted government interfer-

13

ence with freedom of choice in the context of certain personal decisions," including decisions to conceive children, the district court held that the Due Process Clause "does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." (JA 247-48 (quotation marks omitted)). Applying rational-basis review, the district court held that the eligibility limits were a rational exercise of Congress's discretion to determine how to allocate appropriated funds toward medical services for servicemembers and veterans. (JA 248). The district court also held that DoD's requirement did not violate the equal-protection component of the Fifth Amendment because it applied equally to male and female servicemembers. (JA 250-51). As for NOW's section 1557 claim, the district court held that NOW had not established that the denial of IVF benefits was "on the basis of sex" because the service-connection requirement was gender-neutral on its face. (JA 251).

Finally, the district court held that DoD's policy was neither contrary to law nor arbitrary and capricious under the APA. (JA 251-54). The district court held that DoD reasonably invoked 10 U.S.C. § 1074(c)(4) as the only statutory basis for providing IVF benefits, because the other statutes that NOW had asserted as a basis for coverage would have excluded male veterans and private-sector IVF care from coverage, and therefore "would have severely limit[ed] service members' access to IVF." (JA 252-54).

On December 5, 2024, NOW's remaining claims were voluntarily dismissed without prejudice. (JA 255-57). This appeal followed.

14

## Summary of the Argument

The district court's judgment should be affirmed. To begin with, NOW's claims against the VA were barred by the VJRA, which sets forth an exclusive scheme through which a party must assert any challenge to a VA decision affecting benefits. That statutory review system, which allows meaningful Article III review in a federal court of appeals, precludes a district court from asserting jurisdiction over any such challenge, including a claim that a VA policy affecting benefits is unlawful or unconstitutional. NOW's challenge is, as the district court determined, effectively an effort to contest benefits determinations regarding its members, and therefore is precluded by the VJRA. *See infra* Point I.A.1. Moreover, while NOW argues that there is an exception to the VJRA for facial constitutional claims, even if its claim could be characterized in that way, the exception allowed by this Court's precedents cannot stand due to an intervening decision of the Supreme Court, which makes clear that comprehensive and exclusive administrative review systems like the VJRA also prohibit district courts from considering facial challenges. *See infra* Point I.A.2. In addition, the VJRA prohibits district-court review of NOW's claim under the Affordable Care Act: under the Supreme Court's *Thunder Basin* test, that statutory claim falls within the VJRA's review scheme because there is still meaningful judicial review, the claim is not collateral to the specialized review scheme, and it concerns a matter—the administration of health-care benefits—that falls within the agency's expertise. *See infra* Point I.B.

15

NOW's claims also fail on the merits. Its constitutional argument rests on the premise that by subsidizing IVF care for some but not all servicemembers and veterans, the government has infringed those persons' constitutional right to procreate. But even where there is a fundamental right at issue, the government has no constitutional obligation to provide any person with financial resources to exercise that right. Nothing about DoD's or the VA's policies prevents any person from obtaining IVF care, or otherwise exercising their right to conceive and bear children, using their own resources. Nor does the Constitution require equal application of subsidies that the government chooses to provide, as long as there is no exclusion of a suspect class; the government may support IVF care for some without extending it to all veterans and servicemembers (or for that matter, to all Americans). Because no suspect class is involved and there is no infringement of a fundamental right, the government's policy need only be supported by a rational basis, an undemanding test it easily satisfies as the eligibility requirements reasonably reflect concerns of cost and Congress's statutory priorities to allocate benefits. *See infra* Point II.

NOW's statutory claim under section 1557 of the Affordable Care Act—which bars sex-based discrimination in certain health programs—fares no better. That claim is based on a disparate-impact theory. But section 1557 incorporates the standards of Title IX of the Education Amendments of 1972; because no disparate-impact claim is allowed under Title IX, it is not allowed under section 1557 either. And regardless, NOW has not plausibly pleaded any disparate impact resulting from Congress's decision to limit VA IVF

16

benefits to those with service-connected disabilities, and has not pleaded any facts at all concerning DoD's limitation of those benefits to servicemembers who incurred serious illness or injury while on active duty. *See infra* Point III.

Finally, there is nothing arbitrary and capricious about DoD's eligibility requirement. That requirement limiting IVF benefits to servicemembers with a serious illness or injury incurred on active duty is directly derived from its statutory authority to provide such extended health-care benefits. DoD adequately explained the reasons for its policy. And it was not required to explain why it did not attempt to invoke other statutory authorities, which in any event would carry other and greater limitations on DoD's ability to provide IVF benefits, as they apply only to DoD facilities (rather than private care facilities as is now allowed) or only to women (as opposed to all servicemembers under the current policy). *See infra* Point IV.

The district court's judgment should be affirmed.

## A R G U M E N T

### Standard of Review

This Court reviews *de novo* a district court's dismissal of a complaint either for lack of subject matter jurisdiction or for failure to state a claim. *See Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015).

17

## POINT I

## The District Court Lacked Jurisdiction over NOW's Claims Against the VA

### A. The VJRA Precludes NOW's Challenge to VA's Denial of Benefits

The district court lacked subject matter jurisdiction over NOW's claims against the VA because the VJRA creates a comprehensive and exclusive structure for administrative and judicial review, a structure that applies to NOW's constitutional claims.

### 1. NOW's Challenge to the Denial of Benefits or Policies Underlying the Denial of Benefits Is Precluded

The VJRA provides that the VA "shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans or the dependents or survivors of veterans." 38 U.S.C. § 511(a). A veteran may appeal that decision "to the Board of Veterans' Appeals," whose "decision constitutes the Secretary's final determination, which may then be appealed to the Court of Veterans Appeals, an Article I court established by the VJRA with 'exclusive jurisdiction' to review" Board decisions. *Larrabee by Jones v. Derwinski*, 968 F.2d 1497, 1501 (2d Cir. 1992) (citations omitted); 38 U.S.C. §§ 511(b)(4), 7104-7105, 7252, 7292. "Decisions of the Court of Veterans Appeals may then be appealed, but only to the Federal Circuit." *Larrabee*, 968 F.2d at 1501. Subject only to that review system, the VA's decisions are "final and conclusive and may

18

not be reviewed by any other official or by any court, whether by an action in the nature of mandamus or otherwise." 38 U.S.C. § 511(a). The Federal Circuit is the Article III court with "exclusive jurisdiction to review and decide any challenge to the validity of any statute or regulation or any interpretation thereof . . . and to interpret constitutional and statutory provisions, to the extent presented and necessary to a decision." *Id.* § 7292(c). The VJRA thus "precludes federal courts from hearing claims—even if draped in constitutional terms—seeking a particular type or level of medical care." *Larrabee*, 968 F.2d at 1500. "[A]ll issues, even constitutional ones, necessary to a decision which affects benefits" are subject to the VJRA's "exclusive appellate review scheme." *Id.* at 1501.

Applying these rules, the district court correctly held it lacked subject matter jurisdiction under the VJRA because NOW "is essentially challenging the denial of benefits on behalf of its members." (JA 243). As alleged, one NOW member, a Navy veteran, underwent intrauterine insemination and fertility medications through the VHA, but was deemed ineligible for IVF services "because she lacks a confirmed service connection for her infertility diagnosis." (JA 29-30). A second NOW member who is also a Navy veteran "has been told that their service-connected disability is not a direct cause of their infertility, but rather a secondary cause, and therefore does not satisfy the conditions required by" the service-connection requirement. (JA 30; *accord* JA 16 ("NOW-NYC's members include . . . veterans denied IVF coverage by Defendants because of each of the [challenged conditions]")). These examples illustrate how NOW's veteran members

19

sought "a particular type . . . of medical care"—IVF—that was denied by the VA; the VJRA therefore "precludes [the Court] from hearing [those] claims." *Larrabee*, 968 F.2d at 1500.

NOW argues that the VJRA only governs review of individualized denials of benefits. (Br. 21-23). But "section 511(a) is not so narrow"—it prohibits district-court "review of the validity of a VA policy that leads directly to the denial of certain benefits for most, if not all, of the veterans it affects." *Blue Water Navy Vietnam Veterans Ass'n, Inc. v. McDonald*, 830 F.3d 570, 574 (D.C. Cir. 2016). "[T]he text of section 511 make[s] no mention" of a limitation to individual benefits determinations; moreover, by creating an exception to § 511(a)'s prohibition of judicial review for "VA actions of general applicability," Congress demonstrated that it understood that bar to encompass more than individual determinations.[3] *Id.*

NOW relies on an earlier decision of the D.C. Circuit to contend the VJRA's bar to jurisdiction applies only when a district court cannot resolve a legal question "without determining the propriety of an individual VA benefits decision," as the VA does not have "'*exclusive* jurisdiction to construe laws affecting the provision of veterans benefits.'" (Br. 23-24

---

[3]    That exception is in § 511(b)(1), allowing a petition for review of VA rulemaking to the Federal Circuit. The other exceptions are for disputes concerning certain insurance, § 511(b)(2), or housing and small business loans, § 511(b)(3).

20

(quoting *Broudy v. Mather*, 460 F.3d 106, 112 (D.C. Cir. 2006))). But context demonstrates that *Broudy*—a suit that sought access to records from DoD, not benefits from the VA, 460 F.3d at 110[4]—does not support NOW's position. The *Broudy* court cited two cases for the limitation it stated—one where a veteran relied on the Rehabilitation Act and the VA decision under review declined to address that statutory question, and another where a lawyer claimed he was entitled to a share of his client's benefits as his fee. 460 F.3d at 112-14 (citing *McKelvey v. Turnage,* 792 F.2d 194 (D.C. Cir. 1986), and *Hanlin v. United States,* 214 F.3d 1319 (Fed. Cir. 2000)). Based on those examples, it concluded that § 511(a) does not apply simply because a claim "somehow involves a law affecting the provision of benefits." *Id.* But it does apply where provision of benefits is more directly at issue: "review in the district courts is barred when underlying the claim is an allegation that the VA unjustifiably denied a veteran['s] benefit," even when a veteran challenges "VA policies of general applicability, such as regulations or interpretations." *Blue Water*, 830 F.3d at 574-75

––––––––––

[4]    The plaintiffs had sought DoD records concerning their exposure to radiation; as alleged, DoD refused to provide those records, and consequently the VA, considering the plaintiffs' previous benefits application, relied on faulty reconstructed records. But the plaintiffs did not directly seek review of that benefits denial, instead suing for access to the records—an issue relevant to benefits but only in an attenuated way. 460 F.3d at 109-10.

21

("clarify[ing]" that *Broudy* does not "bar[ ] review only of individual determinations"; quotation marks and alterations omitted).

Nor does *Veterans for Common Sense v. Shinseki*, 678 F.3d 1013 (9th Cir. 2012) (en banc), support NOW's theory that § 511 is limited to individual claims. The Ninth Circuit "[s]ynthesiz[ed]" case law from several courts of appeals to "conclude that § 511 precludes jurisdiction over a claim if it requires the district court to review VA decisions that relate to benefits decisions, including any decision made by the Secretary in the course of making benefits determinations"—and observed that that rule of preclusion "extends not only to cases where adjudicating veterans' claims requires the district court to determine whether the VA acted properly in handling a veteran's request for benefits, but also to those decisions that may affect such cases." *Id.* at 1025 (quotation marks omitted). Indeed, "§ 511 broadly divests district courts of jurisdiction over constitutional claims related to benefits even where those claims concern agency procedures and do not challenge specific VA benefits determinations." *Id.* at 1031. NOW relies on the court's response to the plaintiffs' "disavow[al of] relief on behalf of any individual veteran," which the court compared to a "rather apparent effort to avoid the preclusive bite of § 511(a)" in an earlier case, concluding that that tactic "cannot disguise the fact" that the real import of the challenge was to individual determinations. *Id.* at 1026-27. But its conclusion that the case before it involved individual determinations does not limit the general rule it stated, that is, § 511 applies to claims concerning "agency procedures" that "relate to benefits decisions"

22

but "do not challenge specific" individual decisions. *Id*. at 1025, 1031. *Veterans for Common Sense* thus "did not interpret section 511(a) as barring review *only* of individual benefits determinations," but "emphasized the breadth of section 511(a)'s preclusion." *Blue Water*, 830 F.3d at 576. As the Ninth Circuit put it, "Congress was quite serious about limiting our jurisdiction over anything dealing with the provision of veterans' benefits." *Veterans for Common Sense*, 678 F.3d at 1023.

### 2. The VJRA Bars Jurisdiction in District Courts over Facial Challenges to Statutes

NOW next relies on *Johnson v. Robison*, 415 U.S. 361 (1974), and *Disabled American Veterans v. VA*, 962 F.2d 136 (2d Cir. 1992), contending those cases permit them to bring a "facial challenge to a statutory requirement." (Br. 17-18).[5] But that doctrine cannot stand after *Elgin v. Department of Treasury*, 567 U.S. 1 (2012).[6] In that case, the Supreme Court upheld an

_____

[5] "After *Robison* read [the predecessor of § 511] broadly," Congress responded with the VJRA, further limiting the jurisdiction of district courts, and creating the Court of Appeals for Veterans Claims with "power . . . such that its orders not only affect how a single veteran's claim is handled, but will dictate how similar claims are handled by the VA in the future." *Veterans for Common Sense*, 678 F.3d at 1031-32. *Robison* is thus "of limited application." *Id*.

[6] The government did not raise this issue in the district court. But "parties are not required to raise arguments directly contrary to controlling precedent to

23

administrative review system where, like the VJRA, an agency action was reviewed by an administrative board subject to exclusive review in the Federal Circuit. *Id*. at 6. The statute "does not foreclose all judicial review of petitioners' constitutional claims, but merely directs that judicial review shall occur in the Federal Circuit," which was able to provide "meaningful review." *Id*. at 10. Because the statute was clear that Congress intended to foreclose "an additional avenue of review in district court" outside the "elaborate" and "exhaustively detail[ed]" review scheme, jurisdiction in district court was precluded. *Id*. at 10-12 (quotation marks omitted).

More specifically, there was no "exception to [the statute's] exclusivity for facial or as-applied constitutional challenges to federal statutes": "[n]othing in the [statute's] text suggests that its exclusive review scheme is inapplicable simply because a [person] challenges a covered action on the ground that the statute authorizing that action is unconstitutional." *Id*. at 12-13. Such an exception would "seriously undermine[ ]" the statute's "objective of creating an integrated scheme of review," creating the "potential for inconsistent decisionmaking and duplicative judicial review that the [statute] was designed to avoid." *Id*. at 14. *Elgin* thus rejected the idea of "carv[ing] out for district court adjudication only facial constitutional challenges to statutes": the line "is hazy at best and

———————

avoid waiving them." *In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223, 264 (2d Cir. 2016) (quotation marks omitted).

24

incoherent at worst," and "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect." *Id.* at 15 (quotation marks omitted).

Those principles apply equally to the VJRA. Its review scheme is just as comprehensive and exhaustive as that described in *Elgin*. And Congress was just as clear that no other means of judicial review should be allowed, even those concerning the facial validity of statutes: VA decisions are "final and conclusive" and may not be reviewed "by any court" except (after administrative review) the Federal Circuit, which has "exclusive jurisdiction to review and decide any challenge to the validity of any statute . . . and to interpret constitutional and statutory provisions." 38 U.S.C. §§ 511(a), 7292(c).[7]

NOW's challenge demonstrates the incoherence of distinguishing facial from other constitutional challenges. Nowhere in NOW's brief does it explain why its argument qualifies as a facial challenge, which requires a plaintiff to demonstrate the law is "unconstitutional in all its applications" and a court then to "facially invalidate" the statute. *Antonyuk v. James*, 120 F.4th 941, 983 & n.124 (2d Cir. 2024), *cert. denied*, 145

_____

[7] This Court has never cited *Disabled American Veterans* since *Elgin*. One court of appeals has considered a constitutional claim despite the VJRA in that time, but relied on pre-*Elgin* circuit precedent to do so without discussing the Supreme Court's decision. *Recinto v. VA*, 706 F.3d 1171, 1176 (9th Cir. 2013).

25

S. Ct. 1900 (2025). But NOW challenges an appropriations statute that authorizes the treatment NOW seeks to extend—an authorization that NOW presumably believes to have constitutional applications and does not wish to see invalidated. NOW may contend that it only challenges the words "service-connected" in defining who is eligible for the benefit. But that is a request for the Court to "excise individual applications" of a valid statute, not a facial challenge to the validity of the statute itself. *Gonzales v. Raich*, 545 U.S. 1, 23 (2005). As the district court recognized, NOW "is essentially challenging the denial of benefits on behalf of its members," seeking to "force the VA to provide coverage for IVF treatment," "exactly the sorts of claims that Congress intended to keep out of the hands of [the district court] and, instead, in the VJRA process." (JA 242-44).

The district court therefore correctly held that it lacked jurisdiction over NOW's claims against the VA.[8]

---

[8] If the Court were to agree that this challenge was properly brought in district court, that would only extend to NOW's facial constitutional claim, namely, that the service-connected requirement infringes a constitutional right to procreate; it would not permit any nonconstitutional claim based on the ACA or APA to proceed.

26

## B. The District Court Lacked Jurisdiction over NOW's Section 1557 Claims Against the VA

Separately, NOW argues the VJRA does not apply specifically to its claims under section 1557 of the ACA, 42 U.S.C. § 18116. As an initial matter, NOW forfeited this argument by not raising it below. (Dist. Ct. ECF No. 57); *see Tannerite Sports, LLC v. NBCUniversal News Group*, 864 F.3d 236, 252-53 (2d Cir. 2017) ("an appellate court will not consider an issue raised for the first time on appeal," particularly "where those arguments were available to the parties below and they proffer no reason for their failure to raise the arguments below" (quotation marks omitted)).

Regardless, the VJRA precludes jurisdiction over the section 1557 claim. As described above, Congress intended to channel all questions of law and fact necessary to the provision of veterans' benefits through a specialized review mechanism, which applies to NOW's section 1557 challenge.

The Supreme Court has identified three factors—known as the *Thunder Basin* factors—that determine whether a claim falls under a special statutory review scheme. *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 186 (2023) (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994)); *accord Tilton v. SEC*, 824 F.3d 276, 281 (2d Cir. 2016). The first factor asks whether precluding district court jurisdiction would "'foreclose all meaningful judicial review'" of that claim. *Axon Enterprise*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212-13). The second factor considers whether the claim to be precluded is "'wholly

27

collateral to'" the review provisions of the channeling statute. *Id.* (quoting 510 U.S. at 212). And the third factor considers whether the claim falls "'outside the agency's expertise.'" *Id.* (quoting 510 U.S. at 212). "When the answer to all three questions is yes, 'we presume that Congress does not intend to limit jurisdiction.'" *Id.* (quoting *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 489 (2010)).

Regarding the first factor, veterans who are denied IVF benefits because of the service-connection requirement can obtain "meaningful judicial review" of a claim that the requirement violates section 1557. As described above, the VJRA process allows the Board of Veterans Appeals, the Court of Appeals for Veterans Claims, and the Federal Circuit to consider "all questions of law . . . necessary to a decision by [the VA] under a law that affects the provision" of VA benefits to veterans. 38 U.S.C. § 511(a). That broadly worded authority covers a section 1557 claim, and the VJRA's system of adjudication adequately preserves the opportunity for Article III review. *See Elgin*, 567 U.S. at 9-10; *Thunder Basin*, 510 U.S. at 215 ("petitioner's statutory and constitutional claims here can be meaningfully addressed in the Court of Appeals" following decision by independent commission); *Tilton*, 824 F.3d at 278, 283 (administrative review scheme "ultimately offers the losing party a route to federal appellate review" and "assures that the appellants have an opportunity for meaningful judicial review of their [constitutional] claim").

28

Contrary to NOW's assertions, the decision of the Court of Appeals for Veterans Claims ("CAVC") to decline jurisdiction over certain claims arising out of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, does not mean NOW's section 1557 claims fall outside the VJRA's review scheme. (Br. 27). In that case, *Camacho v. Nicholson*, the CAVC considered the case of a VA employee, and explained that the ADA and Rehabilitation Act provide remedies "for discrimination by an employer based on an unfounded perception that a person suffers from a disability," claims that the Board of Veterans Appeals and the CAVC are not authorized to hear. 21 Vet. App. 360, 366 (2007). But such an employment-discrimination case brought under the Rehabilitation Act or ADA does not implicate VA-administered benefits. Similarly, in *Powers v. McDonough*, disabled veterans sued three government agencies following the failure of a consent decree promising them housing, and alleged, among other things, that the VA must accommodate their disabilities by providing housing near a VA facility so they could access their VA benefits. 713 F. Supp. 3d 695, 713-14 (C.D. Cal. 2023), *appeal pending*, No. 24-6338 (9th Cir.). As the district court concluded, the plaintiffs were therefore not seeking a VA benefit at all, meaning the VJRA did not apply. *Id.* at 714-17. But none of the logic in those cases suggests that the CAVC and Board of Veterans Appeals would lack jurisdiction over a section 1557 claim.

As for the second *Thunder Basin* factor, a claim is not "wholly collateral" to a specialized review scheme where it is "procedurally intertwined with the

29

[agency's] ongoing proceeding," *Tilton*, 824 F.3d at 287, or serves as the "vehicle by which [plaintiffs] seek to reverse" the agency's decisions, *Elgin*, 567 U.S. at 22. Here, NOW's claim is for a benefit to be provided and is therefore not collateral to an administrative process that determines whether they should in fact receive that benefit. *See Heckler v. Ringer*, 466 U.S. 602, 610, 614 (1984). NOW's assertion that the VA's service-connection requirement discriminates on the basis of sex in violation of section 1557 is an effort to reverse the VA's longstanding policy, as required by the VA Appropriations Act, to deny IVF benefits to veterans who cannot demonstrate that a service-connected disability caused their infertility. Such a claim for benefits is not collateral to the benefits-review process.

Nor does a section 1557 claim fall outside the VA's expertise under the third *Thunder Basin* factor. Unlike the claims of employment discrimination or to ensure a reasonable accommodation for disabilities in housing, the administration of health-care benefits is at the heart of the VA's expertise. NOW conclusorily asserts that its section 1557 claim is simply "not the sort that is regularly adjudicated in the VJRA appellate mill." (Br. 29). But the Board of Veterans' Appeals, the CAVC, and the Federal Circuit each have addressed arguments under various provisions of the Affordable Care Act in several contexts.[9] While NOW's

---

9   *See Wolfe v. McDonough*, 28 F.4th 1348, 1355-56 (Fed. Cir. 2022) (considering Affordable Care Act arguments in challenge to a VA regulation prohibiting

30

section 1557 claim focuses specifically on discrimination, at the heart of its theory is how certain costly medical benefits—assisted reproductive technology and IVF—can be applied fairly, a question the VA is thoroughly equipped to determine.

Accordingly, the district court correctly held that it lacked subject matter jurisdiction over claims against the VA.

## POINT II

### NOW Failed to State a Substantive Due Process Claim Under the Fifth Amendment

Even if the district court had subject matter jurisdiction over NOW's claims against the VA, the claims should be dismissed on the merits, as the district court did for the same claims against DoD. (JA 244 n.10).

---

the reimbursement of certain deductibles and coinsurance to veterans under a federal statute); *Community Health Choice, Inc. v. United States*, 970 F.3d 1364, 1367-81 (Fed. Cir. 2020) (considering claim that government failed to comply with section 1402 of the Affordable Care Act); *Petite v. McDonough*, 35 Vet. App. 64, 66 (2021) (confirming jurisdiction of CAVC over appeal asserting that Affordable Care Act's mandate warranted entitlement to continued benefits under a VA program); Names Redacted by Agency, Docket No. 16-35 496A, 2019 BVA LEXIS 6443, at *6 (B.V.A. Jan. 4, 2019) (acknowledging Affordable Care Act defense in challenge to denial of benefits to veteran's spouse).

31

NOW argues that DoD and the VA have violated its members' Fifth Amendment due process rights by "burden[ing] the exercise of the fundamental right to procreate." (Br. 59-60).[10] But the government's policy choice to limit funding to assist in the exercise of this constitutional right to procreate does not infringe on that right. "[I]t simply does not follow" that a person's constitutional right "carries with it a constitutional entitlement to the financial resources to avail herself" of that right. *Harris v. McRae*, 448 U.S. 297, 316 (1980). The Due Process Clause protects "against unwarranted government interference with freedom of choice

_____

[10] In the amended complaint, NOW advanced a constitutional sex-discrimination claim, which the district court rejected. (JA 249-51). NOW has abandoned that argument on appeal. While it makes passing reference to "the equality guarantees of the Fifth Amendment" (Br. 14, 17, 56), it does so only in advancing its position regarding fundamental rights, and never argues that the policies at issue here impose a sex-based classification that warrants heightened constitutional scrutiny. *See United States v. Skrmetti*, 145 S. Ct. 1816, 1828-29 (2025). It has therefore forfeited the point on appeal. *See Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 107 (2d Cir. 2012) ("Merely mentioning or simply stating an issue in an appellate brief is insufficient to preserve it for our review: an appellant must advance an argument, and we generally will decline to consider issues that are not sufficiently argued." (quotation marks and alteration omitted)).

32

in the context of certain personal decisions"—but whatever the scope of that freedom, the Constitution "does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." *Id.* at 317-18. In short, "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) (quotation marks omitted); *accord Webster v. Reproductive Health Services*, 492 U.S. 490, 507 (1989) ("the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual" (quotation marks omitted)).

Thus, no matter what protection the Constitution affords regarding a person's choice to procreate, that does not carry with it any constitutional entitlement to assisted reproductive technology paid for by the government. The VA's and DoD's policies concerning IVF "place[] no governmental obstacle in the path" of any person seeking to have children; they merely decline to subsidize that choice. *McRae*, 448 U.S. at 315. Active-duty servicemembers and veterans may still access private IVF treatment or other assisted reproductive technologies as avenues of procreation that are within "the full range of constitutionally protected freedom of choice." (Br. 6, 11 ("to access IVF care" veterans must "pay[] out of pocket")). But nothing in the Constitution requires the government to fund that option. *McRae*, 448 U.S. at 316.

33

NOW nonetheless insists that the eligibility requirements are subject to heightened scrutiny because they "confer[ ] IVF benefits unequally." (Br. 61). There is no apparent limit to that argument—NOW's position would suggest that by providing IVF benefits to some servicemembers, the government must provide the same benefits to all Americans. But even limited to the context of servicemembers and veterans, the case law does not support NOW's contention. In *McRae*, the Court upheld against constitutional challenge a statute that restricted federal funding for some medically necessary abortions but not others, even though at the time the Court's cases held that abortion was a constitutionally protected right. 448 U.S. at 312-17. Congress's choice to provide a subsidy for the exercise of a constitutional right to some but not all does not make it invalid: "[a]lthough Congress has opted to subsidize medically necessary services generally, but not certain medically necessary abortions, the fact remains that [the statute's limitation] leaves an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have had if Congress had chosen to subsidize no health care costs at all." *Id*. at 317; *see Rust*, 500 U.S. at 193 ("The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way."); *Webster*, 492 U.S. at 509 (state laws not allowing abortions in public hospitals "only restrict a woman's ability to obtain an abortion to the extent that she chooses to use a physician affiliated with a

34

public hospital"). Just as it is "not the law" that "strict scrutiny applies whenever Congress subsidizes some speech, but not all speech," it is not the law that Congress must provide funding support for all who seek IVF treatment if it provides such support for some. *Regan v. Taxation With Representation*, 461 U.S. 540, 545-49 (1983); *see National Endowment for the Arts v. Finley*, 524 U.S. 569, 587-88 (1998) (upholding subsidy for some First Amendment protected expression but not others); *see also Brooklyn Legal Services Corp. v. Legal Services Corp.*, 462 F.3d 219, 230 (2d Cir. 2006) ("while the First Amendment has application in the subsidy context, the government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech at stake"), *abrogated on other grounds*, *Bond v. United States*, 564 U.S. 211 (2011).

Thus, while a government decision to "provid[e] medical care" is (like all government action) "subject to constitutional limitations," it remains the case that "[t]he Constitution imposes no obligation on [the government] to pay" those expenses, or to do so equally unless the law "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *Maher v. Roe*, 432 U.S. 464, 469-70 (1977) (quotation marks omitted). No suspect class is at issue here. *Cf. United States v. Skrmetti*, 145 S. Ct. 1816, 1829 (2025) (mere reference to sex in statute governing medical treatment does not trigger heightened scrutiny because "[s]ome medical treatments and procedures are uniquely bound up in sex"). While NOW contends that the "fundamental right to procreate" is infringed,

35

*Maher* rejected an equal-protection challenge to an un-
equal subsidy of such a "fundamental right" because
the "constitutionally protected interest" involved in
that right was one "in making certain kinds of im-
portant decisions free from governmental compulsion."
*Maher*, 432 U.S. at 473 (quotation marks omitted); *ac-
cord id.* at 473-74 ("the right protects the woman from
unduly burdensome interference with her freedom to
decide"). Lack of a subsidy is not compulsive, and
therefore does not implicate that right—the Constitu-
tion permits the government to "make a value judg-
ment favoring" some activities over others "and to im-
plement that judgment by the allocation of public
funds" as long as it "impose[s] no restriction" on the
right that "was not already there." *Id.* at 474. NOW
cites numerous cases that hold unconstitutional laws
that either limit rights based on an invidious classifi-
cation or impose affirmative obstacles to exercising
those rights (Br. 57-61 (citing *Pavan v. Smith*, 582
U.S. 563 (2017); *Obergefell v. Hodges*, 576 U.S. 644
(2015); *Cleveland Board of Education v. LaFleur*, 414
U.S. 632 (1974); *Eisenstadt v. Baird*, 405 U.S. 438
(1972)))—but none of those concern the issue of selec-
tive subsidies, which was addressed directly by *Maher*,
*McRae*, and other constitutional cases cited above.

Because the eligibility requirements do not "jeop-
ardize[ ] [the] exercise of a fundamental right," they
need only "rationally further a legitimate state inter-
est"; "there [need only be] a plausible policy reason for"
the requirements. *Nordlinger v. Hahn*, 505 U.S. 1, 10-
11 (1992). A policy satisfies rational-basis review "if
there is any reasonably conceivable state of facts that
could provide a rational basis for the classification."

36

*FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313-14 (1993). A governmental policy "bear[s] a strong presumption of validity ... and those attacking [its] rationality ... have the burden to negative every conceivable basis which might support it." *Id.* at 314-15 (quotation marks omitted). Further, rational-basis review is especially deferential "where the legislature must ... engage in a process of line-drawing" to identify "governmental beneficiaries" because that task "inevitably requires that some persons," even those who might "have an almost equally strong claim to favored treatment[,] be placed on different sides of the line." *Id.* at 315-16 (quotation marks omitted). That "the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *Id.* at 316. Rational-basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 313.

The DoD and VA requirements clear this bar. After providing for primary health services to qualifying servicemembers and veterans, Congress decided to provide certain additional benefits—including those that DoD has determined to use for IVF services—only for servicemembers who incurred serious injuries or illnesses on active duty (10 U.S.C. § 1074(c)(4)(A)) or for veterans with a service-connected disability (VA Appropriations Act section 234). An obvious, "reasonably conceivable" justification for targeting benefits in that way is that Congress concluded it was important to compensate military service by alleviating the disabling effects of veterans' service-related injuries or illnesses. This justification is especially sound in the

37

context of expensive IVF benefits.[11] *See Schweiker v. Wilson*, 450 U.S. 221, 237 (1981) ("congressional desire to economize in the disbursement of federal funds" and thus "limit distribution of" certain benefits to particular groups is not "an irrational basis for withholding" those benefits from others). "Awarding this type of benefit[] inevitably involves the kind of line-drawing that will leave some . . . outside the favored circle," and so Congress must "have discretion in deciding how to [allocate] necessarily limited resources" among potential beneficiaries. *Id.* at 238.

In response, NOW argues that DoD and the VA cannot rely on purported post hoc justifications for their requirements. (Br. 14, 49, 62-63). Yet under the rational-basis test, it is "irrelevant whether" a stated justification "in fact underlay the [relevant] decision." *U.S. Railroad Retirement Board v. Fritz*, 449 U.S. 166, 179 (1980). The question is whether "there are plausible reasons for" that decision. *Id.* NOW also challenges the relevant justifications as "radically under-

_____

[11] *See, e.g.*, 159 Cong. Rec. S3611-03 (May 20, 2013) (statement of Sen. Gillibrand) ("[i]t costs more than $12,000 for a couple to undergo one cycle of infertility treatment"); Reproductive Biology and Endocrinology Journal, National Institute of Health, National Library of Medicine (Aug. 4, 2022), https://perma.cc/DC8N-EVPX ("[The American Society for Reproductive Medicine] states that the average cost of an IVF cycle in the US is $12,400. However, other studies estimate the cost per cycle at approximately $20,000-$25,000.").

38

inclusive," in that individuals "with Category II/III injuries or illnesses who cannot specifically link their conditions to their infertility are barred from IVF coverage." (Br. 50). But a policy may be rational even if it draws lines that are "imperfect" and is "to some extent both underinclusive and overinclusive." *Vance v. Bradley*, 440 U.S. 93, 108 (1979); *accord Heller v. Doe*, 509 U.S. 312, 321 (1993) ("[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends."); *Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 489 (1955) (a legislature "may select one phase of one field [of a problem to be addressed] and apply a remedy there, neglecting the others"); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466 (1981) (state "need not strike at all evils at the same time or in the same way," and may implement solutions "that only partially ameliorate a perceived evil" (quotation marks omitted)).

NOW avers that because DoD already covers "medically or psychologically necessary services and supplies required in the diagnosis and treatment of illness or injury," or "services of comparable medical necessity to IVF," regardless of the severity of the illness or injury incurred on active duty, DoD should also cover IVF as a "medically necessary" treatment. (Br. 46-47 (citing 32 C.F.R. §§ 199.4(a)(1)(i), 199.4(c)(2)(xiii), 199.4(e)(8)(i))). In doing so, NOW injects its own view as to what is "medically necessary," ignores that benefits may be provided pursuant to separate statutes with different conditions, and disregards the fact that all extended benefits, including IVF, that DoD provides under 10 U.S.C. § 1074(c)(4) are also limited to

39

servicemembers "who incur a serious injury or illness on active duty." *See* TRICARE Operations Manual, Ch. 17, Sec. 3, ¶ 2.7.2.1; *see also* ¶¶ 2.7.2.4.2-2.7.2.4.5 (listing benefit coverage for, *inter alia*, inpatient, outpatient, and comprehensive home health care supplies and services; training, rehabilitation, special education and assistive technology devices; institutional care; and home health services), 2.7.2.8-2.7.2.12 (respite care benefits).[12] Similarly, certain other medical benefits provided by the VA also contain a service-connected disability requirement. *See, e.g.*, 38 U.S.C. § 1712(a)(1)(A)-(C) (authorizing the VA to furnish certain outpatient dental services, treatment, and appliances for a service-connected dental condition or disability); *id.* § 1728(a)(1), (2) (authorizing VA reimbursement of certain emergency treatment related to veteran's service-connected disability). Simply put, neither DoD nor the VA fully covers, for all servicemembers and veterans, a treatment that is identical (or even substantially similar) to IVF in all relevant respects. There is therefore no disparity suggesting irrational distinctions.

NOW next argues that the eligibility requirements are irrational because federal civilian employees are covered by Federal Employee Health Benefit ("FEHB") plans that provide certain IVF benefits. (Br. 48). However, NOW is comparing dramatically different health benefit systems. FEHB policies are provided through

---

[12] TRICARE Operations Manual 6010.62-M, https://manuals.health.mil/pages/DisplayManualHtml-File/2025-01-17/AsOf/TOT5/C17S3.html (April 2021).

40

private insurance companies and coverage is based on extensive negotiations between those companies and the Office of Personnel Management. *See* 5 C.F.R. § 890.203(a)(2) (private insurance companies may submit "benefit and rate proposals to OPM . . . in order to be considered for participation in" the FEHB and "OPM may make counter-proposals at any time"). By contrast, the TRICARE program and the VHA are federally administered health care programs, under which coverage is not provided through private insurers and services may be delivered directly at military or VA facilities. *See* 32 C.F.R. §§ 199.17(a), 199.1(d)-(e); 38 C.F.R. §§ 17.36, 17.38; Benefits.gov, *Basic Medical Benefits Package for Veterans*, https://perma.cc/86CW-NJ3Q; VA, *Eligibility for community care outside VA*, https://perma.cc/ZTN8-YAHN. Further, health care through DoD and the VA is heavily subsidized, while federal employees generally pay a larger portion of their health insurance premiums. *See* 5 C.F.R. § 890.502(a); 10 U.S.C. §§ 1073d, 1075a(a)(1); 38 U.S.C. § 1710. It is, at minimum, "reasonably conceivable" that the differences in coverage between federal civilian employee health insurance policies and military and veterans' health programs are properly attributable to the differences in how each is authorized, formed, funded, and administered. *Beach Communications, Inc.*, 508 U.S. at 313-14. NOW thus fails to overcome the "strong presumption of constitutionality" that applies "to legislation conferring monetary benefits." *Schweiker*, 450 U.S. at 238 (quotation marks omitted).

41

## POINT III

### NOW Failed to State a Claim Under the Affordable Care Act

The district court held that NOW did not adequately plead a claim of sex discrimination under section 1557 of the Affordable Care Act because DoD's eligibility requirement was gender-neutral and applied to both male and female servicemembers. (JA 251). NOW asserts that the district court "implied" that it needed to plead intentional discrimination and urges this Court to hold that section 1557 sex discrimination claims can be based on disparate impact. (Br. 30-43). NOW again forfeited this argument by not raising it below (Dist. Ct. ECF No. 57), and thus the district court did not consider or decide it.[13] (JA 251).

Even if the argument is preserved, section 1557 does not permit disparate-impact suits for sex discrimination claims. Section 1557 provides that "an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 [race, color, national origin], title IX of the Education Amendments of 1972 [sex], the Age Discrimination Act of 1975 [age], or section 504 of the Rehabilitation Act of 1973 [disability], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under," any

---

[13] NOW also has not argued in its opening brief on appeal that it adequately pleaded intentional discrimination under section 1557, thereby forfeiting that argument as well. *JP Morgan Chase Bank v. Altos Hornos de Mexico*, 412 F.3d 418, 428 (2d Cir. 2005).

42

federally administered health program. 42 U.S.C. § 18116(a). "Thus, rather than crafting independent grounds, § 1557 incorporates grounds from other listed statutes." *Lucas v. VHC Health*, 128 F.4th 213, 219 (4th Cir. 2025). "To remedy a § 1557 violation, the 'enforcement mechanisms provided for and available under'" the listed statutes "shall apply." *Id*.; *accord Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 588 (8th Cir. 2022).

Thus, under section 1557, the specific incorporated statute governs the type of discrimination claim—intentional discrimination or disparate-impact—that can be actionable. "[T]he statute picks up the type of discrimination—the standard for determining discrimination—prohibited under each of the four incorporated statutes." *Doe v. BlueCross BlueShield of Tennessee, Inc.*, 926 F.3d 235, 238 (6th Cir. 2019). "By referring to four statutes, Congress incorporated the legal standards that define discrimination under each one." *Id*. at 239. Rather than "creat[ing] a brand-new single standard for what qualifies as discrimination," "Congress made plain that it prohibited discrimination in the provision of health care by incorporating and enforcing the substantive standards of liability of the four named statutes." *Id*. at 239-40. If the incorporated statute does not permit a disparate-impact claim, then neither does section 1557 if the discrimination claim is based on that named statute. *Id*. at 238. In short, a plaintiff cannot "state a Section 1557 claim for [a particular type of] discrimination on a disparate impact theory, regardless of whether [the statute referred to in section 1557(a)] would permit a disparate impact

43

claim." *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1209 (9th Cir. 2020) (agreeing with *BlueCross*).[14]

No court of appeals has disagreed. NOW argues for a single standard for all grounds of discrimination based on a decade-old unpublished district court decision whose analysis has been rejected by other courts. (Br. 34 (citing *Rumble v. Fairview Health Services*, No. 14-CV-2037, 2015 WL 1197415, at *12 (D. Minn. Mar. 16, 2015))).[15] Alternatively, NOW relies on a 2016

---

[14] NOW argues that the use of the disjunctive "or" in section 1557(a)'s last sentence ("The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.") "means that any of the enforcement mechanisms used by the incorporated statutes are available to every claim of discrimination under Section 1557, regardless of the plaintiff's protected class." (Br. 35). The opposite is true: "Had Congress wished to make all of the enforcement mechanisms available for any classification, it would have said '[t]he enforcement mechanisms provided for and available under title VI, title IX, section 504, *and* such Age Discrimination Act shall apply'—instead of the *or* it opted to use." *BlueCross*, 926 F.3d at 239. The Sixth Circuit's interpretation is confirmed by Congress's use of the word "such" preceding the references to the four statutes, thus linking each enforcement mechanism back to its substantive standard in section 1557(a)'s first sentence.

[15] *See Weinreb v. Xerox Business Services*, No. 16 Civ. 6823, 2020 WL 4288376, at *4 (S.D.N.Y. July 27,

44

HHS interpretation that section 1557 "authoriz[es] a private right of action for claims of disparate impact discrimination on the basis of any of the criteria enumerated in the legislation." HHS, Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375, 31,440 (2016). But HHS itself has withdrawn that interpretation: in a 2020 rulemaking, the Department "eliminate[d] the 2016 Rule's . . . provisions related to . . . disparate impact on the basis of sex." HHS, Nondiscrimination in Health and Health Education Programs or Activities, 85 Fed. Reg. 37,160, 37,162 (2020); *accord id.* at 37,195-96 ("to the extent any of the underlying statutes [in section 1557] authorize disparate impact claims, this final rule will recognize such claims," but "conforms the Section 1557 Rule to HHS's Title IX regulations [regarding sex discrimination], under which the disparate impact standard does not apply"). And in its 2024 revision of these rules, HHS recognized some commenters' call to restore the 2016 rule's interpretation of section 1557 authorizing disparate-impact claims "for all grounds of prohibited discrimination," but "decline[d] to revise regulatory text to adopt a stance on the appropriate standards

_____

2020) ("*Rumble* is not persuasive"); *Briscoe v. Health Care Serv. Corp.*, 281 F. Supp. 3d 725, 737-38 (N.D. Ill. 2017) (disagreeing with *Rumble*); *York v. Wellmark, Inc.*, No. 16-cv-627, 2017 WL 11261026, at \*15-18 (S.D. Iowa Sept. 6, 2017) (same), *aff'd on other grounds*, 965 F.3d 633 (8th Cir. 2020); *Southeastern Pennsylvania Transportation Authority v. Gilead Sciences, Inc.*, 102 F. Supp. 3d 688, 698-99 & n.3 (E.D. Pa. 2015) (same).

that apply to private litigants," as "[t]his is an issue appropriately addressed by the Federal judicial branch." HHS, Nondiscrimination in Health Programs and Activities, 89 Fed. Reg. 37,522, 37,654 (2024). Instead, the agency chose to "preserve the longstanding treatment of discrimination in the referenced statutes' implementing regulations consistent with relevant case law." *Id*. at 37,578. Moreover, even had HHS not revised its rule to withdraw the language NOW relies on, the 2016 interpretation contradicted section 1557 itself and therefore "counts for naught." *BlueCross*, 926 F.3d at 240 (rejecting 2016 rule under now-overruled *Chevron* standard); *see also Schmitt v. Kaiser Foundation Health Plan*, 965 F.3d 945, 953 (9th Cir. 2020) (questioning 2016 rule as "based on the assumption that certain civil rights statutes permit disparate impact claims, an assumption that may not be accurate").

Thus, the question is whether a private right of action under Title IX permits a disparate-impact claim. "It's unlikely that Title IX, which was patterned on Title VI, does so," given that the Supreme Court has held that Title VI "doesn't prohibit disparate-impact discrimination." *BlueCross*, 926 F.3d at 240 (citing *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (regarding Title VI)).[16] Indeed, the Supreme Court has

---

[16] NOW notes that the Tenth Circuit in 1987 held that disparate-impact suits may proceed under Title IX. (Br. 42 (citing *Mabry v. State Board of Community Colleges*, 813 F.2d 311, 316 n.6 (10th Cir. 1987)). But that predates *Sandoval*, which "shut [the] door" to

46

described Title IX as "impl[ying] a private right of action to enforce its prohibition on *intentional sex discrimination.*" *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 173 (2005) (emphasis added). Thus, "only *intentional* discrimination, not disparate impact, is actionable under Title IX." *Polenco v. Dallas Independent School District*, 826 F. App'x 359, 362 (5th Cir. 2020); *accord Chance v. Rice University*, 984 F.2d 151, 153 (5th Cir. 1993) (Title IX claims must be analyzed "under the 'intentional discrimination' standard set forth in Title VI"); *Nungesser v. Columbia University*, 169 F. Supp. 3d 353, 363 (S.D.N.Y. 2016) ("although a private plaintiff may bring a claim under Title IX for instances of intentional discrimination, courts have held that a private right of action based on the alleged disparate impact of a policy on a protected group is not cognizable under Title IX"); *Yu v. Vassar College*, 97 F. Supp. 3d 448, 461 & n.6 (S.D.N.Y. 2015) ("numerous courts have dismissed private actions to enforce Title IX itself or regulations implementing Title IX when the allegations were based on a disparate impact theory" (citing cases)); *see also Biediger v. Quinnipiac*

---

disparate impact claims under Title VI and the statutes patterned on it, including Title IX and the Rehabilitation Act. *Schmitt*, 965 F.3d at 953-54 ("For a time, the Supreme Court had construed Title VI to allow disparate impact claims as well. *Sandoval* shut that door. Before the disparate impact door closed, though, we and other circuits relied on the Title VI authority to hold that the Rehabilitation Act permits disparate impact claims." (citations omitted)).

47

*University*, 691 F.3d 85, 97 (2d Cir. 2012) ("Title IX has been construed to prohibit . . . intentional exclusion . . . on the basis of sex.").

Therefore, "a plaintiff suing for sex discrimination under [section 1557] is only able to put forward an intentional discrimination claim, not a disparate impact claim, because Title IX, unlike Title VII, does not provide for disparate impact theories." *Weinreb v. Xerox Business Services, LLC Health & Welfare Plan*, 323 F. Supp. 3d 501, 521 (S.D.N.Y. 2018), *reconsideration denied*, No. 16 Civ. 6823, 2020 WL 4288376, at *3 (S.D.N.Y. July 27, 2020) ("Section 1557 incorporates the standards of Title IX for health discrimination claims under Section 1557, the effect being that a Section 1557 plaintiff cannot allege sex discrimination under a disparate impact theory"). While NOW relies on regulations connected to Title IX (Br. 39-41), section 1557 does not refer to any regulation, and is clear that the substantive standards and enforcement mechanisms come from the incorporated statutes themselves. 42 U.S.C. § 18116(a) ("ground prohibited under" four statutes; "enforcement mechanisms provided for and available under" same four statutes).

Even if section 1557 allowed for sex discrimination claims under a disparate-impact theory, NOW's theory still fails. To establish a disparate-impact claim under one of the civil-rights statutes that permits it, "a plaintiff must first establish a prima facie case by showing (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices."

48

*Saint-Jean v. Emigrant Mortgage Co.*, 129 F.4th 124, 148-49 (2d Cir. 2025) (quotation marks omitted). Courts must "examine with care whether a plaintiff has made out a prima facie case of disparate impact . . . . A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 543 (2015).

NOW has failed to adequately plead a claim under that standard. NOW asserts that infertility occurs far more frequently among women, and in particular is more frequently unexplained, and therefore requiring veterans to demonstrate that their infertility is service-connected has a disproportionate effect on women. (Br. 32, citing JA 176, 182). But NOW has not plausibly pleaded enough factual evidence to support that reasoning.

Even if those premises—that female veterans are far more likely to be infertile than male veterans, and female infertility is more likely to be unexplained—are true, NOW points to nothing to suggest that the service-connected requirement has any impact on either of those rates.[17] The assumed greater preva-

_____

[17] In fact, NOW's amended complaint supports the inference that the alleged infertility disparity between women and men is actually far from clear. It cites a study that concluded, "compared with men, women Veterans had similar odds of lifetime history of infertility." (JA 18 n.4 (citing Jodie Katon et al., *Self-*

49

lence of female infertility could be true regardless of whether that infertility is connected to service, and the greater incidence of infertility with unspecified causes similarly could be the same regardless of a service connection. NOW purports to demonstrate that a certain percentage of infertility cases lack a medical explanation,[18] but that is a different inquiry from whether they are connected to military service—any of the medical causes listed on the charts NOW cites may or may not be service-related, or may be service-related in some proportion, but NOW is unable to plausibly plead any such link. Moreover, under VA policy, where there is "reasonable doubt" or "an approximate balance of positive and negative evidence" regarding the service origin of a disability, "the benefit of the doubt" goes to the veteran. 38 U.S.C. § 5107(b); 38 C.F.R. § 3.102.

As for active servicemembers, NOW cites nothing at all to support any supposed disparity in infertility, much less a disparity in servicemembers whose serious illness or injury incurred on active duty caused their inability to procreate without the use of assisted

---

*Reported Infertility Among Male and Female Veterans Serving During Operation Enduring Freedom/Operation Iraqi Freedom*, 23 J. Women's Health 175, 175, 177 (2013))).

[18] *But see* JA 133, 137 (over three years of study, male infertility was unspecified in 58.3%, 60.6%, and 60.3% of cases; female infertility was unspecified in 59.5%, 59.9%, and 59.8% of cases).

50

reproductive technology. There is therefore nothing in NOW's amended complaint to support its disparate-impact theory against DoD.

Lastly, an alleged disparate impact would not be actionable under section 1557 if the relevant policy serves a legitimate interest. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 998 (1988) (a "disparate impact" claim fails if the relevant policy serves a "legitimate interest," which can include "[f]actors such as . . . cost"); *Inclusive Communities*, 576 U.S. at 541-42 ("cost" is "valid interest"). As explained above, the service-connection requirement serves a legitimate interest in focusing limited resources to provide a costly benefit to veterans with service-connected injuries, as does DoD's eligibility requirement for their service-member counterparts. *See supra* at 36-37. For these reasons, the district court correctly held that NOW failed to state a claim under section 1557.

## POINT IV

### DoD's Policy Is Not Arbitrary and Capricious

Under the APA, "a reviewing court must uphold agency action unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *County of Westchester v. HUD*, 802 F.3d 413, 430-31 (2d Cir. 2015) (quoting 5 U.S.C. § 706(2)(A)). "Under this narrow standard of review, a court is not to substitute its judgment for that of the agency, but instead to assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *DHS v. Regents of the University of California*, 591

51

U.S. 1, 16 (2020) (citations, alterations, and quotation marks omitted). "[A] reviewing court may not set aside an agency [action] that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). Moreover, "competing views about policy" between the agency and those challenging an agency action do not give rise to a claim under the APA. *Safari Club Int'l v. Salazar*, 709 F.3d 1, 3 (D.C. Cir. 2013); *accord FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("a court may not substitute its own policy judgment for that of the agency").

DoD's requirement that to be eligible for IVF benefits an active-duty servicemember must have incurred a serious illness or injury that causes the servicemember to be unable to procreate without assisted reproductive technology is reasonable because it was required by the statute DoD relied upon in offering its IVF benefits. As explained above, DoD is authorized by statute to provide "extended benefits" to servicemembers "to assist in the reduction of the disabling effects" of a serious injury or illness incurred on active duty. 10 U.S.C. § 1079(d)(1) (providing such coverage to dependents); *id.* § 1074(c)(4)(A) (providing servicemembers with coverage "comparable" to that in § 1079(d)). That provision is the basis for DoD's IVF benefit: since 2012, DoD has made clear that the authority for that benefit "is derived from Section 1633 of the 2008 National Defense Authorization Act," which enacted § 1074(c)(4)(A). (JA 46, 100-01); National Defense Authorization Act for Fiscal Year 2008, Pub. L.

52

No. 110-181, § 1633, 122 Stat. 3 (2008). But § 1074(c)(4)(A) only authorizes extended benefits for "members of the uniformed services who incur a serious injury or illness on active duty." Thus, DoD extended IVF benefits to those who require assisted reproductive technology to procreate due to a Category II or III illness or injury. (JA 46 ("The policy applies to service members, regardless of gender, who have sustained serious or severe illness/injury while on active duty that led to the loss of their natural procreative ability."), 100 (substantially the same)).

Congress later endorsed DoD's interpretation of § 1074(c)(4): it defined the VA's authority to provide assisted reproductive technology benefits by reference to the "benefits relating to reproductive assistance provided to a member of the Armed Forces who incurs a serious injury or illness on active duty pursuant to section 1074(c)(4)(A) of title 10, United States Code, as described in the [2012 DoD Memo]." VA Appropriations Act section 234(b)(3); *see Lorillard v. Pons*, 434 U.S. 575, 581 (1978) (where "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law").

NOW characterizes DoD's treatment of IVF as inconsistent with other conditions covered by TRICARE. (Br. 46-48). But medical benefit programs need not cover every condition, and it is not arbitrary and capricious to draw necessary lines—particularly when the governing statute or regulation is worded broadly. *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 98-100 (1st Cir. 2020).

53

NOW claims DoD relies on a post hoc rationalization. (Br. 48-49). To the contrary, DoD has twice provided a contemporaneous rationale for its policy. In 2010, it explained that DoD is "committed to ensuring the maximum support for our members who have become seriously injured as a result of their service," and that "members with spinal and other injuries that make it impossible to conceive a child naturally are not provided TRICARE coverage, which can assist them in becoming a parent." (2010 DoD Memo at 1 (Dist. Ct. ECF No. 52-1)). Accordingly, DoD explained that "[t]he intent of this policy is to . . . provide a quality of life benefit and to assist in reduction of the disabling effects of [the] qualifying condition." (*Id.*). In amending the policy in 2024, DoD reiterated its rationale of supporting servicemembers as authorized by § 1074(c)(4)(A). (JA 99-101). Those explanations satisfy the "narrow" requirement that the agency "articulate a rational connection between the facts found and the choice made." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974) (quotation marks omitted); *accord Prometheus Radio*, 592 U.S. at 423 ("A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."); *Van Hollen v. FEC*, 811 F.3d 486, 496-97 (D.C. Cir. 2016) (arbitrary and capricious review is a "low hurdle" and "does not mean that [agency's] explanation must be a model of analytical precision." (quotation marks omitted)).

NOW next argues that, even if § 1074 authorized DoD's IVF policy, the APA required DoD to "evaluate

54

reasonable alternatives to its choice of statutory authorization." (Br. 54 (citing *State Farm*, 463 U.S. at 50-51)). But "[a]n agency is not required to 'consider all policy alternatives,' or 'every alternative device and thought conceivable by the mind of man'"; it "must consider only significant and viable and obvious alternatives." *MediNatura, Inc. v. FDA*, 998 F.3d 931, 943 (D.C. Cir. 2021) (quoting *State Farm*, 463 U.S. at 51, and *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 551 (1978); other quotation marks omitted). "It may be arbitrary or capricious for an agency to ignore an obvious alternative, such as when the failure to consider an alternative reflects a failure to 'consider an important aspect of the problem.' But [absent a statutory requirement to consider alternatives], under the APA the question is whether the agency acted reasonably in considering the options before it." *California v. EPA*, 72 F.4th 308, 317 (D.C. Cir. 2023).[19]

─────────

[19] *State Farm* is the paradigmatic example of an agency's arbitrary failure to consider alternatives. There, the agency had previously approved two safety measures—automatic seat belts and airbags—to be mandated in automobiles; upon concluding that automatic seatbelts would not provide significant safety benefits, the agency rescinded the entire measure, including the parts concerning airbags. 463 U.S. at 34-39. The Supreme Court concluded the decision was arbitrary and capricious for the agency's failure to consider the alternative of requiring airbags, namely, the device the agency agreed all along would increase safety. *Id.* at 46-48; *see id.* at 51. But the Court expressly stated that the law did not "broadly require an

55

And considering those options "often requires drawing lines," *Mayo Foundation v. United States*, 562 U.S. 44, 59 (2011), and no law requires an agency to stretch its authority to the maximum.

DoD acted reasonably here. NOW has not identified an alternative statutory authority that would enable DoD to provide its current IVF benefits without limitation. NOW claims that two separate statutes, 10 U.S.C. §§ 1074(a) and 1074d(b), could "authorize an IVF regime." (Br. 52). But § 1074(a) covers only "medical . . . care in any facility of any uniformed service," 10 U.S.C. § 1074(a)(1), which would not authorize DoD's current private-sector IVF benefits, *see* 2012 DoD Policy at 2, § III.B (JA 46-47); 2024 DoD Policy at 3 § III.B (JA 100-01). Section 1074d(b) authorizes certain "primary and preventive health care services for women" servicemembers—the provision would, at best, authorize benefits only to "[f]emale members," 10 U.S.C. § 1074d(a)(1). As the district court correctly held (JA 252-53), DoD rationally based its decision to extend IVF benefits on the only statute that would authorize such coverage in private facilities and for male and female servicemembers, 10 U.S.C. § 1074(c)(4), in furtherance of its contemporaneous commitment to ensure maximum support of assisted reproductive

---

agency to consider all policy alternatives in reaching decision." *Id.* at 51. That NOW has conceived of a "policy alternative" as a basis for a different form of IVF benefits does not, therefore, mean that it was arbitrary and capricious for the agencies not to explain why they did not choose that route.

56

technology to all servicemembers "who have become seriously ill or injured as a result of their service" leading to an inability to procreate. (JA 99). NOW's contrary assertion that "[a] combination of overlapping statutory authorities would have made IVF coverage substantially more accessible to service members" (Br. 54) incorrectly assumes that there is a legal obligation for the agency to extend the benefit it provides as far as possible. And it is conclusory; NOW offers no reason to believe that a patchwork of benefits limited to women and limited to DoD facilities would be feasible and would meaningfully increase access to IVF coverage, much less that it was an alternative so obviously viable that DoD was required to consider it. *See MediNatura*, 998 F.3d at 943. Similarly, NOW claims that DoD "should have evaluated whether it should remove its regulatory exclusion of IVF from TRICARE's basic program . . . which would have made IVF broadly available" (Br. 55 (citing 32 C.F.R. § 199.4(e)(3)(i)(B)(3), (g)(34))), but again fails to explain how rescinding the agency's implementing regulations is legally required, would be viable, or would eliminate the limitations embedded in the authorizing statute.

NOW further argues that the eligibility requirement is arbitrary and capricious because it "flies in the face of" Executive Order No. 14,216, which states the current presidential administration's policy "to ensure reliable access to IVF treatment, including by easing unnecessary statutory or regulatory burdens to make IVF treatment drastically more affordable." 90 Fed. Reg. 10,451 (Feb. 18, 2025); (Br. 50, 63). But that Executive Order states that it "is not intended to, and

57

does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party" against the government. "Such orders simply serve as presidential directives to agency officials to consider certain policies when making regulatory decisions. They do not create free-standing private rights to enforce such policies because an executive order is not 'law' within the meaning of the Constitution or the APA." *California v. EPA*, 72 F.4th 308, 318 (D.C. Cir. 2023). NOW "cannot bootstrap private enforcement of executive orders into arbitrary and capricious review." *Id*.

Finally, NOW asserts that DoD was required to consider the allegedly disparate impact of the eligibility requirement on women. (Br. 55-56). As described above, NOW has not pleaded that any such disparate impact exists, particularly regarding active-duty servicemembers. Nor is there any requirement in the APA that "differential impacts" (Br. 55) must be explained. All regulations have differential impacts—regulated parties are treated differently from unregulated ones; those who receive benefits are treated differently from those who do not qualify, *see Mayo Foundation*, 562 U.S. at 59 (agency "reasonably sought a way to distinguish")—and NOW cites no authority that those differences, or a failure to explain them beyond what the usual arbitrary and capricious standard requires, are unlawful.

58

## CONCLUSION

**The judgment of the district court should be affirmed.**

Dated:    New York, New York
             July 7, 2025

                Respectfully submitted,

                JAY CLAYTON,
                *United States Attorney for the*
                *Southern District of New York,*
                *Attorney for Defendants-Appellees.*

TOMOKO ONOZAWA,
BENJAMIN H. TORRANCE,
    *Assistant United States Attorneys,*
            *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,884 words in this brief.

JAY CLAYTON,
*United States Attorney for the*
*Southern District of New York*

By: TOMOKO ONOZAWA,
*Assistant United States Attorney*

**ADDENDUM**

Add. 1

## 10 U.S.C. § 1074—Medical and dental care for members and certain former members

(a)(1) Under joint regulations to be prescribed by the administering Secretaries, a member of a uniformed service described in paragraph (2) is entitled to medical and dental care in any facility of any uniformed service.

. . . .

(c)

. . . .

(4)(A) Subject to such terms and conditions as the Secretary of Defense considers appropriate, coverage comparable to that provided by the Secretary under subsections (d) and (e) of section 1079 of this title shall be provided under this subsection to members of the uniformed services who incur a serious injury or illness on active duty as defined by regulations prescribed by the Secretary.

(B) The Secretary of Defense shall prescribe in regulations—

. . . .

(ii) the definition of serious injury or illness for the purposes of this paragraph.

## 10 U.S.C. § 1074d—Certain primary and preventive health care services

(a) Services Available.—(1) Female members and former members of the uniformed services entitled to medical care under section 1074 or 1074a of this

Add. 2

title shall also be entitled to primary and preventive health care services for women as part of such medical care. The services described in paragraphs (1) and (2) of subsection (b) shall be provided under such procedures and at such intervals as the Secretary of Defense shall prescribe.

(2) Male members and former members of the uniformed services entitled to medical care under section 1074 or 1074a of this title shall also be entitled to preventive health care screening for colon or prostate cancer at such intervals and using such screening methods as the administering Secretaries consider appropriate.

(b) Definition.—In this section, the term "primary and preventive health care services for women" means health care services, including related counseling services, provided to women with respect to the following:

(1) Cervical cancer screening.

(2) Breast cancer screening, including through the use of digital breast tomosynthesis.

(3) Comprehensive obstetrical and gynecological care, including care related to pregnancy and the prevention of pregnancy.

(4) Infertility and sexually transmitted diseases, including prevention.

(5) Menopause, including hormone replacement therapy and counseling regarding the benefits and risks of hormone replacement therapy.

(6) Physical or psychological conditions arising out of acts of sexual violence.

Add. 3

(7) Gynecological cancers.

(8) Colon cancer screening, at the intervals and using the screening methods prescribed under subsection (a)(2).

## 10 U.S.C. § 1079—Contracts for medical care for spouses and children: plans

. . . .

(d)(1) The Secretary of Defense shall establish a program to provide extended benefits for eligible dependents, which may include the provision of comprehensive health care services, including case management services, to assist in the reduction of the disabling effects of a qualifying condition of an eligible dependent. Registration shall be required to receive the extended benefits.

. . . .

(3) In this subsection:

. . . .

(B) The term "qualifying condition" means the condition of a dependent who is moderately or severely mentally retarded, has a serious physical disability, or has an extraordinary physical or psychological condition.

(e)(1) Extended benefits for eligible dependents under subsection (d) may include comprehensive health care services (including services necessary to maintain, or minimize or prevent deterioration of, function of the patient) and case management services with respect to the qualifying condition of such

Add. 4

a dependent, and include, to the extent such benefits are not provided under provisions of this chapter other than under this section, the following:

. . . .

(H) Such other services and supplies as determined appropriate by the Secretary, notwithstanding the limitations in subsection (a)(12).

## 38 U.S.C. § 101—Definitions

For the purposes of this title—

. . . .

(16) The term "service-connected" means, with respect to disability or death, that such disability was incurred or aggravated, or that the death resulted from a disability incurred or aggravated, in line of duty in the active military, naval, air, or space service.

## 38 U.S.C. § 511—Decisions of the Secretary; finality

(a) The Secretary shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans or the dependents or survivors of veterans. Subject to subsection (b), the decision of the Secretary as to any such question shall be final and conclusive and may not be reviewed by any other official or by any court, whether by an action in the nature of mandamus or otherwise.

(b) The second sentence of subsection (a) does not apply to—

Add. 5

(1) matters subject to section 502 of this title;

(2) matters covered by sections 1975 and 1984 of this title;

(3) matters arising under chapter 37 of this title; and

(4) matters covered by chapter 72 of this title.

## 38 U.S.C. § 5107—Claimant responsibility; benefit of the doubt

(a) Claimant Responsibility.—Except as otherwise provided by law, a claimant has the responsibility to present and support a claim for benefits under laws administered by the Secretary.

(b) Benefit of the Doubt.—The Secretary shall consider all information and lay and medical evidence of record in a case before the Secretary with respect to benefits under laws administered by the Secretary. When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant.

## 38 U.S.C. § 7104—Jurisdiction of the Board; decisions; notice

(a) All questions in a matter which under section 511(a) of this title is subject to decision by the Secretary shall be subject to one review on appeal to the Secretary. Final decisions on such appeals shall be made by the Board. Decisions of the Board shall be based on the entire record in the proceeding and upon consideration of all evidence and material of record and applicable provisions of law and regulation.

Add. 6

## 38 U.S.C. § 7252—Jurisdiction; finality of decisions

(a) The Court of Appeals for Veterans Claims shall have exclusive jurisdiction to review decisions of the Board of Veterans' Appeals. The Secretary may not seek review of any such decision. The Court shall have power to affirm, modify, or reverse a decision of the Board or to remand the matter, as appropriate.

(b) Review in the Court shall be on the record of proceedings before the Secretary and the Board. The extent of the review shall be limited to the scope provided in section 7261 of this title. The Court may not review the schedule of ratings for disabilities adopted under section 1155 of this title or any action of the Secretary in adopting or revising that schedule.

(c) Decisions by the Court are subject to review as provided in section 7292 of this title.

## 38 U.S.C. § 7292—Review by United States Court of Appeals for the Federal Circuit

(a) After a decision of the United States Court of Appeals for Veterans Claims is entered in a case, any party to the case may obtain a review of the decision with respect to the validity of a decision of the Court on a rule of law or of any statute or regulation (other than a refusal to review the schedule of ratings for disabilities adopted under section 1155 of this title) or any interpretation thereof (other than a determination as to a factual matter) that was relied on by the Court in making the decision. . . .

Add. 7

(c) The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction to review and decide any challenge to the validity of any statute or regulation or any interpretation thereof brought under this section, and to interpret constitutional and statutory provisions, to the extent presented and necessary to a decision. The judgment of such court shall be final subject to review by the Supreme Court upon certiorari, in the manner provided in section 1254 of title 28.

(d)(1) The Court of Appeals for the Federal Circuit shall decide all relevant questions of law, including interpreting constitutional and statutory provisions. The court shall hold unlawful and set aside any regulation or any interpretation thereof (other than a determination as to a factual matter) that was relied upon in the decision of the Court of Appeals for Veterans Claims that the Court of Appeals for the Federal Circuit finds to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or in violation of a statutory right; or

(D) without observance of procedure required by law.

(2) Except to the extent that an appeal under this chapter presents a constitutional issue, the Court of Appeals may not review (A) a challenge to a factual determination, or (B) a challenge to a law or regulation as applied to the facts of a particular case.

Add. 8

(e)(1) Upon such review, the Court of Appeals for the Federal Circuit shall have power to affirm or, if the decision of the Court of Appeals for Veterans Claims is not in accordance with law, to modify or reverse the decision of the Court of Appeals for Veterans Claims or to remand the matter, as appropriate.

(2) Rules for review of decisions of the Court of Appeals for Veterans Claims shall be those prescribed by the Supreme Court under section 2072 of title 28.

## 42 U.S.C. § 18116—Nondiscrimination [section 1557 of the Affordable Care Act]

(a) In general

Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

Add. 9

**Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, Div. A, Title II, 138 Stat. 25 (2024)**

Sec. 234. (a) Notwithstanding any other provision of law, the amounts appropriated or otherwise made available to the Department of Veterans Affairs for the "Medical Services" account may be used to provide—

(1) fertility counseling and treatment using assisted reproductive technology to a covered veteran or the spouse of a covered veteran; or

(2) adoption reimbursement to a covered veteran.

(b) In this section:

(1) The term "service-connected" has the meaning given such term in section 101 of title 38, United States Code.

(2) The term "covered veteran" means a veteran, as such term is defined in section 101 of title 38, United States Code, who has a service-connected disability that results in the inability of the veteran to procreate without the use of fertility treatment.

(3) The term "assisted reproductive technology" means benefits relating to reproductive assistance provided to a *55 member of the Armed Forces who incurs a serious injury or illness on active duty pursuant to section 1074(c)(4)(A) of title 10, United States Code, as described in the memorandum on the subject of "Policy for Assisted Reproductive Services for the Benefit of Seriously or Severely Ill/Injured (Category II or III) Active Duty Service Members" issued by the Assistant Secretary of Defense for Health Affairs on April 3, 2012, and the guidance issued to implement such policy, including any

Add. 10

limitations on the amount of such benefits available to such a member except that—

(A) the time periods regarding embryo cryopreservation and storage set forth in part III(G) and in part IV(H) of such memorandum shall not apply; and

(B) such term includes embryo cryopreservation and storage without limitation on the duration of such cryopreservation and storage.